# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OCIMUM BIOSOLUTIONS (INDIA) LIMITED and DON A. BESKRONE, Chapter 7 Trustee of Ocimum Biosolutions Inc., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. N15C-08-168 AML CCLD |
| ASTRAZENECA UK LIMITED, | ) ) | |
| Defendant. | ) ) | |

## OPINION

Submitted: September 23, 2019
Decided: December 4, 2019
Corrected and Public Version: December 10, 2019

*Upon Defendant's Motion for Summary Judgment Based on the Statute of Limitations*: **GRANTED.**

Kevin S. Mann, Esquire, Michael L. Vild, Esquire, Christopher P. Simon, Esquire, of CROSS & SIMON, LLC, Wilmington, Delaware, and C. Edward Polk. Jr., Esquire, of POLK LAW PLLC, Ashburn, Virginia, *Attorneys for Plaintiffs*.

Michael P. Kelly, Esquire, Daniel M. Silver, Esquire, Benjamin A. Smyth, Esquire, Steven P. Wood, Esquire, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware, and Dane H. Butswinkas, Esquire, of WILLIAMS & CONNOLLY, LLP, Washington, D.C., *Attorneys for Defendant*.

**LEGROW, J.**

In 2001, Defendant AstraZeneca UK Limited ("AstraZeneca") entered into an agreement with a predecessor of Plaintiff Ocimum Biosolutions (India) Limited ("Ocimum"). That agreement gave AstraZeneca a subscription to access Ocimum's biological databases for a three-year period. At the conclusion of the subscription period, AstraZeneca was required to return or destroy all data in its possession, apart from certain contractually defined results that AstraZeneca was entitled to retain and continue using. This case centers upon Ocimum's core allegation that AstraZeneca wrongfully retained data after the agreement ended.

After four years of contentious litigation regarding AstraZeneca's alleged breach of the parties' contract and misappropriation of trade secrets, many factual and legal issues remain between the parties. Both sides have lodged numerous motions of variable facial merit and spent their resources litigating a case that Ocimum believes could result in a jury verdict worth tens of millions of dollars or more. The considerable resources the parties expended and the potential damages at stake stand in marked contrast to Ocimum's decision to ignore for six years its suspicion that AstraZeneca had breached the contract.

The question before the Court is one of notice, specifically whether information Ocimum knew that strongly suggested AstraZeneca wrongfully retained data placed Ocimum on inquiry notice of its claims more than three years before Ocimum filed suit, even though the full extent of AstraZeneca's alleged wrongdoing

was not apparent until after the lawsuit was filed and discovery commenced. I conclude those facts and Ocimum's suspicions placed it on inquiry notice no later than July 2012, more than three years before Ocimum initiated this action. Accordingly, and for the reasons explained below, AstraZeneca is entitled to summary judgment on all Ocimum's claims.

## I. STATEMENT OF FACTS

AstraZeneca filed its motion for summary judgment based on the statute of limitations on February 18, 2019.[1] The parties briefed and argued that motion along with two other motions. The following facts, unless otherwise noted, are not disputed.[2]

### A. The 2001 Agreement

On May 4, 2001, AstraZeneca and Gene Logic Inc. ("Gene Logic") entered into the GeneExpress® Product Access Agreement (the "2001 Agreement").[3]

---

[1] Def. AstraZeneca UK Limited's Opening Br. in Supp. of its Mot. for Summ. J. Based on the Statute of Limitations ("AZ Mot. Summ. J."); Br. in Supp. of Pls.' Opp'n to Def.'s Mot. for Summ. J. Based on the Statute of Limitations ("Ocimum Resp."); Def. AstraZeneca UK Limited's Reply Br. in Supp. of its Mot. for Summ. J. Based on the Statute of Limitations ("AZ Reply"). The motion's resolution was delayed, at least in part, because trial scheduling issues necessitated the reassignment of this case in August 2019. Oral argument on the motion was held on September 23, 2019.

[2] Although there remain ongoing discovery issues and an associated motion for sanctions between the parties, the discovery issues relate to AstraZeneca's belated production of documents. Because AstraZeneca's statute of limitations argument is premised on Ocimum's documents and its own witnesses' testimony, AstraZeneca's alleged discovery failures and belated production are not a basis upon which the Court can conclude that summary judgment is premature.

[3] App. to Ocimum Resp., Ex. 1 GeneExpress® Product Access Agreement ("2001 Agreement").

2

Through the 2001 Agreement, Gene Logic agreed to provide AstraZeneca non-exclusive access to its "GeneExpress® Product" ("GeneExpress") for a three-year "Access Term" followed by a six-month "Wind-Down Period."[4] At that time, GeneExpress consisted of "BioExpress™, ToxExpress™ and the Gene Logic Software."[5]

BioExpress and ToxExpress are databases.[6] BioExpress contained biological data, including data "derived from untreated [] diseased and normal human tissues[.]"[7] Similarly, ToxExpress contained biological data "associated with the treatment, using known toxic compounds, of[,]" for example, "diseased and normal human tissues[.]"[8] All the data in the BioExpress and ToxExpress databases was "Database Information" under the 2001 Agreement, that is "data and information generated by or for Gene Logic or its Affiliates[.]"[9] Under the 2001 Agreement, Gene Logic solely and exclusively owned all Database Information,[10] and

---

[4] *Id.* at third "Whereas" clause, §§ 1.2, 1.12, 1.32, 4.1(a).
[5] *Id.* § 1.14.
[6] *Id.* §§ 1.7, 1.29.
[7] *Id.* § 1.7.
[8] *Id.* § 1.29.
[9] *Id.* §§ 1.7, 1.10, 1.29. More specifically, the 2001 Agreement defines Database Information as: "[D]ata and information generated by or for Gene Logic or its Affiliates comprising (i) gene expression profiles, (ii) nucleotide sequence information, (iii) protein sequence information and (iv) clinical and other information associated with tissue and cell samples; and any related annotated information . . . ." *Id.* § 1.10.
[10] *Id.* § 3.1.

AstraZeneca was prohibited from providing any Database Information to a third party without Gene Logic's consent.[11]

Although Gene Logic retained sole ownership of all Database Information, AstraZeneca solely owned all "AZ Results."[12] The 2001 Agreement defined AZ Results as "any results or data generated by [AstraZeneca] during the Access Term using the GeneExpress® Product . . . ."[13] AstraZeneca was "free to use, disclose, sell and sublicense any AZ Results,"[14] and with one exception, not relevant here, AstraZeneca had "no obligation to disclose to Gene Logic any AZ Results[.]"[15]

The parties' agreement gave AstraZeneca access to GeneExpress through a server installed by Gene Logic at AstraZeneca's facilities in Delaware, with the option to install additional servers at other AstraZeneca facilities.[16] Initially, BioExpress contained 3709 "samples," and ToxExpress contained 1620.[17] The databases would be updated no less than bi-monthly from physical disks shipped to the AstraZeneca facilities.[18]

AstraZeneca accessed the BioExpress and ToxExpress databases through the Gene Logic Software, which consisted of "software tools for the visualization,

---

[11] *Id.* § 4.1.
[12] *Id.* § 3.2.
[13] *Id.* § 1.4.
[14] *Id.* § 4.1(a).
[15] *Id.* § 3.2.
[16] *Id.* § 1.11.
[17] *Id.* at Schedule C.
[18] *Id.* §§ 2.2–2.3.

4

analysis, indexing and mining of Database Information[.]"[19] Gene Logic retained the rights to "Gene Logic Technology," which included "the Gene Logic Software . . . [and] the data management architecture . . . ."[20] The agreement prohibited AstraZeneca from copying or creating derivative works from the Gene Logic Software.[21]

Once the three-year Access Term expired, the six-month "Wind-Down Period" began.[22] At the end of the Wind-Down Period, the agreement required AstraZeneca immediately to discontinue using GeneExpress and deliver to Gene Logic any and all copies of any Database Information and the Gene Logic Software.[23] AstraZeneca could, however, "retain and continue to use, disclose, sell or sublicense any AZ Results in any manner, at [AstraZeneca's] discretion."[24]

## B.     AstraZeneca's Exit Strategy

Toward the end of the Access Term, AstraZeneca and Gene Logic entered into talks internally and between the parties about whether AstraZeneca would terminate the parties' relationship altogether or continue it in some fashion. Among the continuation options AstraZeneca considered were continuing the Access Term for a fourth year or purchasing a "frozen copy" of GeneExpress, that is, a copy of

---

[19] *Id.* § 1.15.
[20] *Id.* § 1.16.
[21] *Id.* § 4.1(a).
[22] *Id.* §§ 1.32, 4.1(a).
[23] *Id.* § 6.1(c).
[24] *Id.*

GeneExpress "as in existence on the expiration of the Access Term[.]"[25]  In an internal AstraZeneca email, Michael Mallamaci, an AstraZeneca employee, explained these options to other AstraZeneca employees, stating that, if AstraZeneca walked away without a frozen copy of GeneExpress, AstraZeneca still would have the six-month Wind-Down Period to "deploy an exit strategy."[26]

Once AstraZeneca determined that it neither would purchase a frozen copy of GeneExpress nor continue the 2001 Agreement into a fourth year, Mallamaci scheduled an exit strategy implementation meeting for April 23, 2004.[27] At that meeting, AstraZeneca employees discussed how to "refine and implement [the AstraZeneca] exit strategy and at least design and complete all the databases queries and capture the output as 'AZ Results.'"[28] As Mallamaci envisioned it, the exit strategy would include: (1) "Creation of sample sets for each specific disease & normal tissue;" and (2) "Perform[ing] a 'Gene Signature' analysis for each set created."[29]

In addition to deciding what information to search in the database, Mallamaci discussed with AstraZeneca employees how "relational" AstraZeneca wanted or needed the AZ Results to be because the answer would "dictate how we build the

---

[25] *Id.* § 8.1; App. to Ocimum Resp., Ex. 5 Feb. 7, 2004 Mallamaci Email.
[26] App. to Ocimum Resp., Ex. 5 Feb. 7, 2004 Mallamaci Email.
[27] App. to AZ Mot. Summ. J., Ex. 2 Apr. 23, 2004 Mallamaci Email.
[28] *Id.*
[29] *Id.*

'AZ Results' storage environment[,]" *i.e.*, how AstraZeneca would build "global AZ Results databases[.]"[30] On this point, Mallamaci cautioned that AstraZeneca needed to be certain that it was "not impinging on [Gene Logic] property regarding software and schemas."[31]

Initially, AstraZeneca built a database it called Gene Expression of AstraZeneca Results, or "GeAZr," to hold expression and sample data captured from GeneExpress.[32] Later, AstraZeneca started developing "GeAZr II," a project intended to "exploit" and "integrate" the expression data and sample data populating the GeAZr database more fully with expression data generated internally by AstraZeneca.[33] AstraZeneca expressly did not disclose the exit strategy to Gene Logic and went to some lengths to avoid engaging Gene Logic in a discussion about how AstraZeneca was interpreting the meaning of "AZ Results."[34]

Although Gene Logic was not aware of AstraZeneca's exit strategy or the GeAZr database, Gene Logic insisted that AstraZeneca certify its compliance with the 2001 Agreement's termination provisions.[35] On January 5, 2005, John

---

[30] *Id.*
[31] *Id.*
[32] App. to AZ Mot. Summ. J., Ex. 5 Jan. 31, 2005 GeAZr II Project Charter. GeAZr is pronounced "Geezer."
[33] *Id.*
[34] App. to Ocimum Resp., Exs. 29-30, 33, 35 (series of internal AstraZeneca emails and draft letters discussing the meaning of AZ Results and whether to "provoke a response" from Gene Logic on that issue). AstraZeneca ultimately sent a letter to Gene Logic that removed any reference to AZ Results. *See id.* Ex. 35.
[35] Appendix to AZ Mot. Summ. J., Ex. 4 Jan. 5, 2005 Letter.

7

Stageman, AstraZeneca's Vice President of Science and Information, emailed Gene Logic a letter certifying that AstraZeneca ceased its use of GeneExpress, erased all copies of Database Information, and erased all copies of Gene Logic Software.[36] Stageman also certified that AstraZeneca had retained and would continue to use AZ Results.[37]

## C. Ocimum buys Gene Logic's genomics division

On October 14, 2007, Ocimum and its wholly-owned subsidiary, Ocimum USA, acquired Gene Logic's genomics division and allegedly assumed control over GeneExpress and its licensing, including all past or existing licensing agreements.[38] All the relevant events for statute of limitations purposes, or at least for purposes of determining when Ocimum had inquiry notice of its claims, arose after this acquisition. Accordingly, unless otherwise needed for clarity, the remainder of this decision will refer to Ocimum rather than Gene Logic.

---

[36] *Id.*

[37] *Id.*

[38] Whether the 2001 Agreement was assigned to Ocimum is a disputed issue that goes to Ocimum's standing to pursue the claims in this action. This Court denied AstraZeneca's motion to dismiss on the basis of standing, concluding that issue could not be resolved on the pleadings. AstraZeneca again raised standing more recently as a basis to deny Ocimum's motion for partial summary judgment. Because this standing issue is not relevant to the claims' timeliness, and because I am required in any event to view all facts and inferences in Ocimum's favor when resolving AstraZeneca's motion, I assume Ocimum has standing to pursue all the claims in the third amended complaint.

8

## D.    Ocimum's suspicions as of 2009

On March 26, 2009, David Starr, an Ocimum Sales Director,[39] emailed Tom Thompson, Ocimum's Vice President of BioIT Sales, and Jarlath ffrench-Mullen, an Ocimum Scientific Director, notifying them of a conversation between Starr and Amanda Williams, an AstraZeneca scientist.[40] Williams was inquiring about whether significant content had been added to the "CNS Data Suite" since AstraZeneca last had subscribed to it.[41] Starr opined that Williams' statements suggested that she was able to determine "what the content is within the CNS Data Suite[.]"[42] Starr concluded Williams' statements "may underline a suspicion that Darci [Horne] had about [AstraZeneca] not returning materials to Gene Logic after the termination of their subscription."[43]

Thompson replied that same day, stating Starr's email "confirms suspicions from before" and "procession [sic] of the data would mean a breach of termination requirements under the old database subscription."[44] In response, Starr suggested

---

[39] Unless otherwise noted, all references to Ocimum employees' titles are drawn from the January 7, 2009 Ocimum Organizational Chart. *See* App. to Mot. Summ. J., Ex. 7 Ocimum Organization Chart (as of Jan. 7, 2009).

[40] App. to AZ Mot. Summ. J., Ex. 9 Mar. 27, 2009 Email Chain.

[41] *Id.*

[42] *Id.*

[43] *Id.* According to Thompson, Darci Horne was a Business Development Director at Gene Logic. Neither the provenance nor the basis of Horne's suspicion is in the record. Thompson was asked about Horne's suspicions at his deposition, but he had no recollection of the matter. App. to AZ Mot. Summ. J., Ex. 29 July 27, 2018 Dep. Tr. George (Tom) Thompson at 223-24.

[44] App. to AZ Mot. Summ. J., Ex. 9 Mar. 27, 2009 Email Chain.

that "[a] simple paid subscription to CNS would be a better outcome!"[45] Thompson replied to Starr again the next day stating: "They have been breaching our agreement and using Gene Logic data for 3.5 years with [sic] a contract."[46]

After receiving Starr's email, Thompson contacted Subash Lingareddy, Ocimum's President and CFO, and Anuradha Acharya, Ocimum's CEO, stating:

> We need to discuss AZ. There was another slip of the tongue by an [AstraZeneca] researcher that *strongly suggests they kept our data* after the end of their agreement in 2005. *This is a serious breach of termination requirements under the agreement.*[47]

In his deposition, Lingareddy acknowledged that the Starr email triggered Thompson's suspicion that AstraZeneca may have "a copy of the database."[48]

It appears neither Acharya nor Lingareddy responded to this email. Instead, approximately a month later, Acharya contacted Thompson and Ron Hencin, another Ocimum Vice President of Sales. Acharya did not address Thompson's concerns about AstraZeneca's possible breach, but instead inquired if either had followed up on her suggestion that Ocimum initiate contact with Alan Lamont, AstraZeneca's head of "platform technologies." Archaya stated "[t]his will be an important account and I don't want to lose any opportunity in making contact."[49] Thompson told

---

[45] *Id.*
[46] *Id.*
[47] App. to AZ Mot. Summ. J., Ex. 8 Mar. 26, 2009 Thompson Email (emphasis added).
[48] App. to AZ Mot. Summ. J., Ex. 33 Sept. 26, 2018 Dep. Tr. Subash Lingareddy ("Lingareddy Dep. Tr.") at 62:24–63:22.
[49] App. to AZ Mot. Summ. J., Ex. 10 Apr. 27, 2009 Acharya Email.

10

Acharya he had not contacted Lamont, and Thompson reiterated his concern that there "is a bigger content issue at [AstraZeneca] we need to discuss[.]"[50] Archarya replied: "Shall we hold off on writing to him in that case. I know you brought up the issue of them *illegally using the data*[.]"[51]

Within days of Acharya's exchange with Thompson, Mårten Hammar from AstraZeneca contacted John Hartwell, Ocimum's Business Development Director, regarding the status of Ocimum's "Human atlas suite tissue collection."[52] Hartwell corresponded with Hammar through the end of April, providing detailed technical answers regarding Ocimum's database products and inquiring whether AstraZeneca would be interested in regaining access to BioExpress.[53] Hammar expressed some interest and inquired about pricing. In that email dated April 30, 2019, Hammar attached "an example view of [AstraZeneca's] frozen copy of some of the old Gene Logic data" for Hartwell to compare to Ocimum's current offerings.[54] Hammar directed Hartwell to note the "tissue types and number of samples," referring to the data as a tissue panel whose donor information "is probably still stored somewhere at [AstraZeneca]."[55]

---

[50] *Id.*
[51] *Id.* (emphasis added).
[52] App. to AZ Mot. Summ. J., Ex. 11 Apr. 30, 2009 Hammar Email.
[53] *Id.*
[54] App. To Ocimum Resp., Ex. 44 Apr. 30, 2009 Hammar Email.
[55] *Id.*

Hammar's April 30, 2009 reply email regarding AstraZeneca's "frozen copy" is the last email in the chain included in the record before the Court. It appears, however, that Thompson became aware of Hammar's email at some point. On May 21, 2009, two months after receiving Starr's email that "confirm[ed] suspicions from before," and three weeks after Hammar gave Ocimum an example of AstraZeneca's "frozen copy" of Gene Logic data, Tom Thompson reached out to John Herrmann, Ocimum's counsel, to request an opinion on the meaning of "AZ Results."[56] Thompson limited Herrmann's review to 15-30 minutes of billable work.[57] In that email Thompson stated he was aware of two instances of AstraZeneca researchers referring to AstraZeneca's "Gene Logic data."[58] Thompson explained:

> [W]e have also seen a bar graph of content listing the total Gene Logic content AZ has by disease area. For example, a bar graph labeled as 350 CV failing heart sample total. There are hints AZ does have clinical information from these samples. All seems to hinge on the definition of "AZ Results."[59]

The conclusions Herrmann reached are in dispute. Ocimum maintains that Herrmann "agreed with Mr. Thompson's conclusion that the 2009 discussions with [AstraZeneca] did not provide evidence of any wrongdoing."[60] In support of this contention, Ocimum cites an email from Herrmann to Thompson in which Herrmann

---

[56] App. to AZ Mot. Summ. J., Ex. 12 May 21, 2009 Thompson Email.
[57] Id.
[58] Id.
[59] Id.
[60] Ocimum Resp. at 30.

asserts "I reviewed [AstraZeneca] last week and agree with your conclusion."[61] The record, however, does not include exactly what conclusion Thompson relayed to Herrmann.[62] For purposes of the pending motion, I assume Thompson told Herrmann that Thompson did not believe AstraZeneca violated the contract, and Herrmann agreed with that conclusion.

On June 15, 2009, Acharya reached out to Alan Lamont, the AstraZeneca head of platform technologies that Acharya referenced in her April email exchange with Thompson.[63] As in that previous exchange with Thompson, Acharya was not reaching out about AstraZeneca's potential breach of contract. Rather, Acharya sought to speak to Lamont about AstraZeneca potentially "engag[ing] further with our much expanded portfolio of products and services."[64] Acharya testified at her deposition that she did not raise with Lamont the issue of AstraZeneca "illegally using the data," as she phrased the issue in her email exchange with Thompson.[65]

Lamont forwarded Acharya's request to Terry Reed, who expressed interest and suggested the parties arrange a teleconference in July 2009.[66] Acharya agreed,

---

[61] *Id.*; App. to Ocimum Resp., Ex. 51 May 27, 2009 Herrmann Email.

[62] A declaration Ocimum submitted in conjunction with its opposition to the summary judgment motion avers that Thompson independently concluded AstraZeneca had not breached the 2001 Agreement and Herrmann later concurred in that conclusion. *See* Lingareddy Decl. ¶ 15; *but see* Section II(D), *infra.*

[63] App. to AZ Mot. Summ. J., Ex. 13 June 15, 2009 Acharya Email.

[64] *Id.*

[65] App. to AZ Mot. Summ. J., Ex. 10 Apr. 27, 2009 Acharya Email; App. to AZ Mot. Summ. J., Ex. 31 Aug. 20, 2018 Dep. Tr. Anuradha Acharya ("Acharya Dep. Tr.") at 159:6–161:19.

[66] App. to AZ Mot. Summ. J., Ex. 13 June 15, 2009 Acharya Email.

and soon thereafter, Hartwell, Ocimum's Business Development Director who received the example of AstraZeneca's "frozen copy" of some "old Gene Logic data" from Mårten Hammar, contacted Reed about the July meeting, relaying that he had been in talks with Hammar about creating "a custom Affymetrix Exon database."[67] Neither Acharya nor Hartwell inquired about AstraZeneca's potential breach of contract in this email chain. Rather, Ocimum seemed focus on preserving and further developing the parties' business relationship. No contracts or agreements ultimately resulted from those discussions.

### E. Ocimum's suspicions as of July 2012

In June 2012, Jing Guo, a graduate student who had worked with AstraZeneca, published her Master's Thesis as an article titled "Tissue-Specific Gene Expression Analysis" (the "2012 Guo Article").[68] Guo performed "a meta-analysis on normal human tissues using a computational approach" to investigate gene expression patterns, and the project was carried out "within Research and Development Information at AstraZeneca[.]"[69] Among those Guo expressly thanked was Mårten Hammar, who previously forwarded AstraZeneca's "frozen copy" of Gene Logic data.[70]

---

[67] *Id.*

[68] App. to AZ Mot. Summ. J., Ex. 14 2012 Guo Article.

[69] *Id.* at 1–2.

[70] *Id.* at 2.

In the article, Guo identified four "large-scale microarray datasets" that she used to analyze gene expression patterns.[71] One of these microarray datasets was the GeAZr database, which Guo described as an AstraZeneca "in-house data source which was purchased from GeneLogic by AstraZeneca."[72] Guo described the GeAZr database as containing "44928 human genes expressed across 100 normal tissues[.]"[73]

The 2012 Guo Article was published in June 2012, and in July 2012, Acharya emailed Mårten Hammar and Marcus Bjåreland, an AstraZeneca employee Guo listed as her supervisor. In that email, Acharya referenced Guo's thesis and stated "someone from [AstraZeneca] is still using BioExpress."[74] Acharya offered to discuss a license for AstraZeneca.[75] At her deposition, Acharya confirmed that her conclusion, after receiving notice of the 2012 Guo Article, was that AstraZeneca was still using BioExress.[76] Archarya likewise testified that the 2012 Guo Article, and specifically Guo's reference to GeAZr data purchased from Gene Logic, led her to believe that AstraZeneca had "the database."[77] At his deposition, Lingareddy

---

[71] *Id.* at 8.
[72] *Id.*
[73] *Id.*
[74] App. to AZ Mot. Summ. J., Ex. 15 July 10, 2012 Acharya Email; App. to AZ Mot. Summ. J., Ex. 16 July 11, 2012 Acharya Email.
[75] App. to AZ Mot. Summ. J., Ex. 15 July 10, 2012 Acharya Email; App. to AZ Mot. Summ. J., Ex. 16 July 11, 2012 Acharya Email.
[76] Acharya Dep. Tr. at 169:1–170:11.
[77] *Id.* at 225-26 (AZ Reply Ex. A).

testified that the 2012 Guo Article raised Ocimum's suspicion that it may have a claim against AstraZeneca.[78]

On August 31, 2012, Andrew Gorecki, senior counsel for AstraZeneca, emailed Acharya stating that the 2001 Agreement permitted AstraZeneca to retain AZ Results and that the GeAZr data source Guo used was a data source AstraZeneca developed that incorporated AZ Results.[79] Gorecki asserted that Guo's reference to AstraZeneca purchasing GeAZr from Gene Logic was "incorrect and [AstraZeneca] will remove the reference to this from the paper."[80]

Lingareddy remained unconvinced. Acharya forwarded Gorecki's response to Lingareddy, who stated "[u]nless they have a perpetual license they cannot publish this. He is blowing smoke. We need to explore this further."[81] Lingareddy confirmed at his deposition that Ocimum remained suspicious even after it received Gorecki's email.[82] Ocimum did not, however, undertake any additional investigation at that time.

---

[78] Lingareddy Dep. Tr. at 126:17–128:12. In its opposition to the motion for summary judgment, Ocimum filed a declaration Mr. Lingareddy authored in which he directly contradicts his sworn deposition testimony. For the reasons set forth below in Section II(D), even if the Court considered and relied on that declaration, the factual dispute regarding Mr. Lingareddy's suspicions does not alter the inquiry notice analysis.
[79] App. to AZ Mot. Summ. J., Ex. 17 Aug. 31, 2012 Gorecki Email.
[80] *Id.*
[81] App. to AZ Mot. Summ. J., Ex. 18 Aug. 31, 2012 Lingareddy Email.
[82] Lingareddy Dep. Tr. at 161:2–16.

## II.   ANALYSIS

Under Superior Court Civil Rule 56, a party is entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[83]   A material issue of fact exists if "a rational finder of fact could find some material fact that would favor the nonmoving party in a determinative way[.]"[84]   The record must be viewed in the light most favorable to the non-moving party.[85]

The initial burden is on the moving party to demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[86] If the moving party meets that initial burden, the burden shifts to the non-moving party to show that a genuine issue of material fact is in dispute.[87] "It is not enough for the opposing party merely to assert the existence of such a disputed issue of fact[,]" and "[i]f the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment."[88]

Where, as here, the question of tolling the statute of limitations turns on the issue of inquiry notice, summary judgment is appropriate if there is a "red flag" that

---

[83] Super. Ct. Civ. R. 56(c).

[84] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

[85] *Gruwell v. Allstate Ins. Co.*, 988 A.2d 945, 947 (Del. Super. 2009).

[86] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[87] *Id.* (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[88] *Id.* (citing *Wootten v. Kiger*, 226 A.2d 238, 239 (Del. 1967)).

17

"clearly and unmistakably" would lead a prudent person to investigate and thereby discover the basis for the cause(s) of action alleged.[89]

Ocimum's Third Amended Complaint contains four causes of action: (1) breach of contract; (2) unjust enrichment; (3) misappropriation of trade secrets; and (4) injunction (to enjoin misappropriation of trade secrets).[90] Although factually complex, all those claims turn on Ocimum's contention that AstraZeneca retained Database Information in violation of the 2001 Agreement and Delaware's trade secret law.

In Delaware, the statute of limitations for breach of contract or unjust enrichment is 3 years.[91] Normally, the statute of limitations begins to run "at the time of the wrongful act."[92] The limitations period, however, may be tolled: (1) in cases of "concealment or fraud;" or (2) if the injury inherently is unknowable and the claimant blamelessly is ignorant of the wrongful act and injury alleged.[93]

Under 6 *Del. C.* § 2006, the statute of limitations for a trade secret misappropriation claim also is 3 years. Unlike breach of contract and unjust

---

[89] *See Boerger v. Heiman*, 965 A.2d 671, 675 (Del. 2009).

[90] Third Am. Compl. ¶¶ 162–210. The parties have not addressed this Court's jurisdiction, or lack thereof, to issue an injunction.

[91] 10 *Del. C.* § 8106; *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013) (explaining that 10 *Del. C.* § 8106 applies to breach of contract claims); *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *15 (Del. Ch. Dec. 1, 2009) (same for unjust enrichment).

[92] *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004).

[93] *Id.* (citing *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 132–33 (Del. 1974)).

18

enrichment claims, however, the statute of limitations for trade secret claims begins to run "after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."[94]

Ocimum filed its original complaint on August 21, 2015. Therefore, if the statutes of limitation began to run as a matter of law before August 21, 2012, AstraZeneca's summary judgment motion should be granted. Ocimum maintains that the doctrines of fraudulent concealment and inherently unknowable injuries tolled the statutes of limitation for the breach of contract and unjust enrichment claims, and further argues the trade secret claims could not have been discovered until after August 21, 2012.

## A. A jury reasonably could conclude the statutes of limitation were tolled for a period of time.

For the doctrine of fraudulent concealment to toll the limitations period, the defendant must have engaged in an affirmative act of concealment, which Delaware case law defines as "an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry."[95] Similarly, the doctrine of inherently unknowable injuries

---

[94] 6 *Del. C.* § 2006.
[95] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (citing *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973)), *aff'd*, 725 A.2d 441 (Del. 1999); *see Nardo v. Guido DeAscanis & Sons, Inc.*, 254 A.2d 254, 256 (Del. Super. 1969) (citing 34 Am. Jur. *Limitation of Actions* § 234 (1941)) ("Fraudulent concealment required something affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise

19

will toll the statute of limitations "while the discovery of the existence of a cause of action is a practical impossibility."[96] In order for the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and a plaintiff must show it blamelessly was ignorant of the act or omission and the injury.[97]

Whether a statute of limitations was tolled generally is a question of fact. Viewing the evidence in the light most favorable to Ocimum, whether the limitations period was tolled by AstraZeneca's fraudulent concealment is a genuine factual issue. Ocimum claims AstraZeneca affirmatively misled it with John Stageman's certification that AstraZeneca ceased its use of GeneExpress, erased all copies of Database Information, and erased all copies of Gene Logic Software.[98] Whether AstraZeneca intended to put Ocimum "off the trail of inquiry" with Stageman's certification so as to toll the statute of limitations under 10 *Del. C.* § 8106 cannot be determined as a matter of law on the record before the Court.

The factual record requires the same conclusion with respect to the inherent unknowability of Ocimum's claims. It is reasonable to infer from the record that Ocimum did not have any access to the GeAZr database and did not have any

---

to a cause of action-some actual artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry.").

[96] *Dean Witter*, 1998 WL 442456, at *5 (citing *Ruger v. Funk*, 1996 WL 110072, at *2 (Del. Super. Jan. 22, 1996)).

[97] *Id.*

[98] Ocimum Resp. at 59 (discussing App. to AZ Mot. Summ. J., Ex. 4 Jan. 5, 2005 Letter).

contractual right at termination to demand details regarding what information AstraZeneca retained as "AZ Results." AstraZeneca concedes it did not advise Ocimum of AstraZeneca's "exit strategy." A reasonable jury could conclude that before 2009, when Thompson and others began receiving information that raised their suspicions about a possible breach, (i) it would have been practically impossible for Ocimum to discover its claim, and (ii) Ocimum was not to blame for AstraZeneca's alleged breach or any associated injury.

Having concluded that the record precludes judgment as a matter of law regarding whether Ocimum's breach of contract claim was tolled, the question shifts to whether AstraZeneca can point to undisputed facts that compel the conclusion that Ocimum was on inquiry notice of its claim more than three years before it filed this action.

## B. Ocimum was on inquiry notice of a breach of contract claim in 2009.

Even when the limitations period is tolled, whether by fraudulent concealment, inherently unknowable injury, or otherwise, the statute of limitations begins to run when (i) a plaintiff has actual notice of the basis for the cause of action, or (ii) a plaintiff has notice of facts from which the basis for the cause of action

21

"could have been discovered by the exercise of reasonable diligence."[99] This second category is referred to as "inquiry notice."

The undisputed facts in the record compel the conclusion as a matter of law that Ocimum was, at a minimum, on inquiry notice before August 21, 2012 of facts that should have prompted it to investigate a breach of contract claim. A person is on inquiry notice when they objectively are aware of facts "sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of facts constituting the basis of the cause of action.[100] Inquiry notice does not require that a plaintiff be aware "of all of the aspects of the alleged wrongful conduct."[101] Rather, "the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme."[102]

Delaware courts exploring inquiry notice consistently have held that a party is on inquiry notice when it has "facts sufficient to make [it] suspicious[] or that ought to make [it] suspicious[.]"[103] Those facts effectively must rise to the level of

---

[99] *Dean Witter*, 1998 WL 442456, at *5 (citing *Halpern*, 313 A.2d at 143); *Coleman*, 854 A.2d at 842 (quoting *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982)) ("[T]he statute of limitations begins to run upon the discovery of facts 'constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of such facts.").

[100] *Coleman*, 854 A.2d at 843 (quoting *Becker*, 455 A.2d at 356); *see Dean Witter*, 1998 WL 442456, at *6 ("[T]he limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong[.]").

[101] *Dean Witter*, 1998 WL 442456, at *7.

[102] *Id.* (citing *McCoy v. Goldberg*, 748 F. Supp. 146, 158 (S.D.N.Y. 1990)).

[103] *See, e.g., iBio, Inc. v. Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V.*, 2018 WL 6493503, at *5 (Del. Ch. Dec. 10, 2018); *Welenc v. Univ. of Delaware*, 2017 WL

22

a "red flag" that would prompt a prudent person of ordinary intelligence to further investigate a possible claim.[104]

Ocimum cannot realistically resist the conclusion that several of its high-level employees and executives were suspicious by April 2009 that AstraZeneca had retained more than it was entitled to retain under the 2001 Agreement. Thompson, Vice President of BioIT Sales, concluded in March 2009 that information provided by an AstraZeneca scientist "confirm[ed Ocimum's] suspicions" that AstraZeneca breached the 2001 Agreement's termination requirements and had remained in breach ever since. Thompson promptly raised his concerns with Lingareddy and Acharya, Ocimum's President and CEO, respectively.[105] Thompson advised Lingareddy and Acharya that the information Williams provided "strongly suggests" that AstraZeneca retained Gene Logic's data at the end of the contract term, which Thompson described as a "serious" breach.[106] According to Lingareddy, Thompson believed AstraZeneca had a copy of the database. Thompson's suspicions only were heightened a month later when Ocimum received communications from another

---

5665652, at *4 (Del. Super. Nov. 20, 2017); *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010); *Dean Witter*, 1998 WL 442456, at *5.

[104] *Wilhelm v. Marston*, 2013 WL 6170625, at *6 (Del. Super. Nov. 20, 2013); *see also Coleman*, 854 A.2d at 843.

[105] App. to AZ Mot. Summ. J., Ex. 9 Mar. 27, 2009 Email Chain; App. to AZ Mot. Summ. J., Ex. 8 Mar. 26, 2009 Thompson Email.

[106] App. to AZ Mot. Summ. J., Ex. 8 Mar. 26, 2009 Thompson Email.

AstraZeneca employee referring to AstraZeneca's "frozen copy" of Gene Logic data and providing an example of that frozen copy.

These facts were more than enough to make a prudent person suspicious that AstraZeneca had breached the 2001 Agreement's termination requirements. Thompson's email communications to Ocimum's top executives demonstrate that he was, indeed, suspicious. Ocimum argues, however, that these suspicions were not enough to place it on inquiry notice of its claim because (1) suspicions alone are not enough to place a party on inquiry notice under the Delaware Supreme Court's decision in *In re Asbestos Litigation*, (2) Ocimum conducted a diligent inquiry and its suspicions were allayed, and (3) the facts Ocimum knew did not give it notice of the true nature of AstraZeneca's breach of the 2001 Agreement, which only came to light during discovery in this case.

With respect to Ocimum's first argument, the inquiry notice standard articulated in *In re Asbestos Litigation*[107] relates to latent disease cases and does not apply to the claims at issue in this case. In the *Asbestos Litigation* case, the Delaware Supreme Court concluded that the plaintiff's subjectively held belief that he had an asbestos-related ailment, without any objective evidence to support his belief, was not sufficient to support the conclusion as a matter of law that the plaintiff had inquiry notice of his claim. The Court reasoned, under the "unusual circumstances

---

[107] 673 A.2d 159, 163 (Del. 1996).

24

of the case," that a plaintiff's subjective belief that he had as asbestos injury did not constitute a "discovery" of his injury when "every diagnostic test performed on [the plaintiff] failed to find any link between his physical condition and asbestos exposure."[108] The Court emphasized the difficulty in fixing the limitations period in latent disease cases and explained that the inquiry is case-specific and depends on a number of factors, including:

> (1) the plaintiff's level of knowledge and education; (2) the extent of his recourse to medical evaluation; (3) the consistency of the medical diagnosis; and (4) plaintiff's follow-up efforts during the period of latency following initial recourse to medical evaluation.[109]

That case, and the four-part standard it adopts regarding notice, does not readily extend beyond the latent disease context. Put differently, the inquiry notice standard adopted in *Asbestos Litigation* does not alter the inquiry notice standard expressly followed in numerous Delaware cases after *Asbestos Litigation* was decided. Those cases confirm that inquiry notice arises upon the discovery of facts sufficient to put a person of ordinary intelligence on inquiry that, if pursued, would lead to the discovery of sufficient facts to plead a cause of action.[110] Facts that make a person suspicious of a cause of action manifestly are ones that should prompt a person to investigate further.

---

[108] *Id.*
[109] *Id.*
[110] *Coleman*, 854 A.2d at 842.

25

Ocimum next argues that its consultation with Mr. Herrmann constituted a diligent inquiry that dispelled it suspicions, which precludes any finding of inquiry notice. Given Ocimum's strong suspicions that a large pharmaceutical firm had retained all or part of Ocimum's database and was using it, no reasonable jury could conclude Ocimum conducted a diligent inquiry by asking counsel to look into the issue for no more than 30 minutes.[111] To be "diligent," an inquiry must be "reasonable"; once a plaintiff's suspicions are triggered, he is expected to act with alacrity to explore those suspicions as well as other possible instances of non-compliance.[112] Ocimum urges the Court to view the advice it received from counsel as a disputed factual issue precluding summary judgment, but the only facts in the record about Ocimum's investigation show that Thompson arbitrarily limited the amount of time counsel could spend on the assignment. There is no record of what material counsel considered to conduct that review, whom he consulted at Ocimum, or how he reached and explained his conclusions. In short, Ocimum cannot rely on this bare factual record as a basis to argue that a jury could conclude that Ocimum

---

[111] App. to AZ Mot. Summ. J., Ex. 12 May 21, 2009 Thompson Email.

[112] *See, e.g., In re Tyson Foods, Inc.*, 919 A.2d 563, 585, 590-91 (Del. Ch. 2007) (holding that plaintiffs are under an obligation to exercise reasonable diligence and the statute of limitations will not shield a dilatory plaintiff who fails to act with such care); *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *10-11 (Del. Ch. Jan. 24, 2005) (holding that once a plaintiff had notice that at least one of the facilities purchased was not in the warranted condition, the plaintiff was "duty-bound to investigate and try to discover all of its claims" against the defendant); *Dean Witter*, 1998 WL 442456, at *6 (holding that a plaintiff in possession of facts that make him suspicious must conduct a reasonably diligent inquiry).

acted with reasonable diligence in investigating its suspicions.[113] Ocimum did not put forward any such facts and therefore cannot meet its burden in opposing the motion on this basis.

In the face of new, countervailing information, Ocimum similarly was not entitled to continue relying on AstraZeneca's certification that it complied with the terms of the 2001 Agreement.[114] As the Court of Chancery explained in *Dean Witter*, even a plaintiff who reasonably relies on the competence and good faith of a fiduciary "still must be reasonably attentive to his interests" and cannot put on "blinders."[115] Ocimum and AstraZeneca were not in a fiduciary relationship, and Ocimum therefore should be expected to be more, rather than less, attentive to its interests.

Finally, as to Ocimum's contention that the facts it knew in 2009 did not reveal the true nature and extent of AstraZeneca's alleged breach of the 2001 Agreement, that argument misses the point. Delaware courts consistently have

---

[113] AstraZeneca argued that the fact Ocimum consulted counsel indicates as a matter of law that it was on inquiry notice of its claims. There is some case law to support that argument. *See Wilhelm*, 2013 WL 6170625, at *6 (quoting *Began v. Dixon*, 547 A.2d 620, 623 (Del. Super. 1988)), *aff'd*, 2014 WL 4748608 (Del. Sept. 25, 2014). That precedent, however, arises in different factual contexts than the issue before this Court. In any event, I need not rely on that case law given my conclusions above. I also have not adopted AstraZeneca's argument that Ocimum is "bound by the acts of [its] lawyer-agent." *See Levey*, 76 A.3d at 769 (quoting *Vance v. Irwin*, 619 A.2d 1163, 1165 (Del. 1993)).

[114] *See Dean Witter*, 1998 WL 442456, at *7–8 (discussing information available to the plaintiffs that undermined their assertion that their reliance on the defendants' representations tolled the statute of limitations, "the critical inquiry . . . is: were plaintiffs entitled to rely on defendants' representations for as long as they did[?]") (alterations omitted).

[115] *Id.* at *8 (alterations omitted).

27

concluded that inquiry notice may arise before a plaintiff has full or complete knowledge of the extent of its claims.[116] Here, Ocimum was aware from more than one source that AstraZeneca possessed and continued to use data that Ocimum suspected was inconsistent with the 2001 Agreement's termination provisions. The fact that Ocimum did not become aware of the extent of AstraZeneca's alleged breaches until after discovery commenced in this case does not mean Ocimum was not on inquiry notice in April 2009 of its breach of contract claim.

## C. Ocimum also was on inquiry notice of a breach of contract claim in July 2012.

Even if the Court concluded that the information Ocimum knew in 2009 did not rise to the level of inquiry notice, or even if Ocimum's brief consultation with counsel constituted a diligent inquiry, the record nevertheless is clear that Ocimum was on inquiry notice by July 2012 and possessed at that time sufficient facts on which to assert a breach of contract claim against AstraZeneca. This action therefore is time-barred for that separate reason.

---

[116] *See, e.g., iBio, Inc.,* 2018 WL 6493503, at *6 ("Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiff['s] awareness of all of the aspects of the alleged wrongful conduct.") (internal quotations omitted); *VLIW Tech., LLC v. Hewlett-Packard Co.,* 2005 WL 1089027, at *15 (Del. Ch. May 4, 2005) ("Courts have consistently rejected the notion that the 'statute of limitations only begins running when a plaintiff can unassailably establish a legal claim for trade secret misappropriation, [as that] would effectively eviscerate the statute of limitations in all cases in which the plaintiff never discovers 'smoking gun' evidence of misappropriation.'"); *BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex, Inc.,* 2012 WL 1901269, *8 (D. Del. May 15, 2012) (holding the fact that a plaintiff "could reasonably discern that *he suffered some harm caused by the defendant's conduct* [was] sufficient to" trigger the statute of limitations) (emphasis added).

28

Guo's article reflected that she worked with AstraZeneca employees, including Mårten Hammar, and was given access to a "large-scale microarray dataset" that Guo explained was an in-house source AstraZeneca purchased from Gene Logic. Guo described the dataset as containing "44928 human genes expressed across 100 normal tissues."[117] Ocimum's CEO and President both were suspicious after reading the 2012 Guo Article. Indeed, Lingareddy testified at his deposition that the 2012 Guo Article made him suspicious that Ocimum had a claim against AstraZeneca. Acharya similarly testified that the 2012 Guo Article, and specifically the reference to data AstraZeneca purchased from Gene Logic, led her to believe that AstraZeneca "had the database" and was using it.[118] Acharya went so far as to specifically raise her suspicions directly with AstraZeneca.

Ocimum's suspicions based on the 2012 Guo Article, coupled with the information previously obtained from AstraZeneca in 2009, more than met the inquiry notice standard. In fact, by July 2012, Ocimum did not just have sufficient facts to prompt a diligent inquiry, it had sufficient facts adequately to plead a cause of action against AstraZeneca for breach of contract. Armed with those facts, Ocimum cannot rescue its untimely claims by arguing it relied on Andrew Gorecki's

---

[117] App. to AZ Mot. Summ. J., Ex. 14 2012 Guo Article at 8.
[118] Acharya Dep. Tr. at 169-70, 225-26.

August 31, 2012 email stating that the database Guo referenced was a data source AstraZeneca developed after the Wind-Down Period using AZ Results.

That statement should not have – and in fact did not – allay Ocimum's suspicions. If anything, AstraZeneca's express admission that it developed its own database using data it classified as AZ Results should have prompted Ocimum to wonder whether AstraZeneca retained not just data but some or all of the Gene Logic Software. Ocimum should have been alarmed, rather than placated, by AstraZeneca's admission that it created its own data source using data obtained during the license period, which Guo described as a "large-scale dataset" containing "44928 human genes expressed across 100 normal tissues." In any event, there is no factual basis on which the jury could conclude Ocimum relied on Gorecki's representation. Lingareddy's contemporaneous reaction to Gorecki's email confirms that he believed AstraZeneca was "blowing smoke" and his suspicions were not allayed.[119]

Ocimum contends inquiry notice did not arise in July 2012 because no amount of additional investigation would have uncovered AstraZeneca's allegedly wrongful conduct. Ocimum points out that the original theories advanced in its first complaint are not the theories on which it now relies, and the true nature of AstraZeneca's

___

[119] See Tyson Foods, 919 A.2d at 585 ("Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.")

breach of contract and trade secret misappropriation was not apparent until after discovery commenced in this case.

Ocimum relies on cases like *Incyte Corp. v. Flexus Biosciences, Inc.*[120] to argue that summary judgment should be denied when there is a factual dispute as to whether any further investigation would have revealed a sufficient factual basis to plead a cause of action.[121] Although it is true that courts will not apply the statute of limitations in a way that forces litigants to file suits "based merely on suspicions and fears[,]"[122] it equally is true that the statute of limitations begins to run, at the latest, when a plaintiff has such suspicions *and* sufficient facts to state a cause of action. Accordingly, *Incyte* and the other cases on which Ocimum relies are inapposite because none of those cases involved a plaintiff with sufficient facts to plead a cause of action. Again, inquiry notice is not limited to cases in which a plaintiff has full knowledge of all the facts and the existence of a claim; inquiry notice is triggered when a plaintiff has knowledge of sufficient facts to support a claim. Although Ocimum might not have been able to discover the precise facts on which it now

---

[120] 2017 WL 7803923 (Del. Super. Nov. 1, 2017).
[121] *Incyte*, 2017 WL 7803923, at *5; *see also Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 691 F. Supp. 2d 577, 594 (D. Del. 2010) (denying summary judgment because it was not clear that a deeper investigation by plaintiffs would have uncovered its cause of action); *Coleman*, 854 A.2d at 843 (holding the Court erred in granting summary judgment because, *inter alia*, if the plaintiffs were on inquiry notice, "it cannot be determined, on the present record, whether a diligent inquiry by plaintiffs would have uncovered facts sufficient for them to assert an accounting malpractice claim.").
[122] *Accenture*, 691 F. Supp. 2d at 594.

31

relies to support its claim, Ocimum had sufficient facts to state a breach of contract claim based on the same essential factual contention: that AstraZeneca retained data after termination in breach of the 2001 Agreement.

## D. The Lingareddy declaration does not inject into the record disputed factual issues that preclude summary judgment.

In support of its opposition to AstraZeneca's Motion, Ocimum submitted a declaration by Subash Lingareddy. AstraZeneca maintains that the declaration is a "sham affidavit," and the Court should not consider it. As an initial matter, I agree that Lingareddy's declaration likely constitutes a "sham affidavit" that cannot be relied upon to defeat a motion for summary judgment. A sham affidavit is one submitted by a party opposing summary judgment in an effort to contradict earlier sworn deposition testimony.[123] The Court will strike such an affidavit if it finds the following factors are met: the affidavit (i) contradicts prior sworn testimony, (ii) given in response to unambiguous questions, (iii) yielding clear answers, (iv) without adequate explanation, (v) in order to defeat a summary judgment motion.[124]

The Lingareddy declaration satisfies those factors. Through the declaration, Lingareddy attempts to contradict or hedge his deposition testimony regarding Ocimum's suspicions in 2009 and 2012. As just one example, Lingareddy states in

---

[123] *Shimko v. Honeywell Int'l Inc.*, 2014 WL 4942189, at *4 (Del. Super. Sept. 30, 2014); *In re Asbestos Litig.*, 2006 WL 3492370, at *4 (Del. Super. Nov. 28, 2006).
[124] *Id.*

32

his deposition that the 2012 Guo Article did not prompt suspicions at Ocimum because it did not refer to data being "normalized," and such suspicions did not arise until Guo published a second article in 2013.[125] In contrast, Lingareddy testified at his deposition, plainly and in response to unambiguous questions, that specific statements and pages in the 2012 Guo Article fueled Ocimum's suspicion that AstraZeneca was using the Gene Logic database and had "normalized" the data.[126] Ocimum does not offer an adequate explanation for Lingareddy's changed recollection.

Even if the Court considered Lingareddy's declaration, however, the testimony contained therein does not alter the Court's conclusions regarding inquiry notice. Even if Lingareddy himself was not suspicious, Ocimum's other representatives' testimony establishes that Ocimum was suspicious by July 2012 that AstraZeneca improperly retained Database Information. Acharya believed in July 2012 that AstraZeneca had the database and was using it, and Acharya's suspicions and the facts known to Ocimum are more than enough to constitute inquiry notice under Delaware law.

---

[125] Lingareddy Decl. ¶ 26.

[126] Lingareddy Dep. Tr. at 126-28. Although Lingareddy states in his declaration that the 2012 Guo Article did not refer to data being "normalized," that is inaccurate. *See* App. to AZ Mot. Summ. J., Ex. 14 2012 Guo Article at 8; Third Am. Compl. ¶¶ 27-36.

## E. The continuing breach doctrine does not preserve Ocimum's claims.

Ocimum contends the continuing breach doctrine[127] tolls the statute of limitations with respect to its breach of contract claims.[128] Although Ocimum characterizes this doctrine as a "tolling" theory, the doctrine properly is applied in determining when a claim accrues.[129] The continuing breach doctrine creates an exception to the rule that a breach of contract claim accrues at the time a contract is breached.[130] The doctrine acknowledges that there may be limited circumstances in which a breach of contract claim cannot be alleged at the time of breach because damages cannot be ascertained at that time. Under this exception, if there is a continuing injury for which the damages cannot be determined until the alleged wrong ceases, the statute of limitations begins to run on the last date of the alleged wrong.[131]

The continuing breach doctrine applies in narrow and unusual factual situations where the alleged wrongful acts are so inexorably intertwined that there is but one continuing wrong.[132] This is not such a situation.[133] Ocimum argues

---

[127] The doctrine alternatively is called the "continuous contract" doctrine.
[128] Ocimum Resp. at 65-66.
[129] *AM General Holdings LLC v. The Renco Group, Inc.*, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016).
[130] *Id.*
[131] *Branin v. Stein Roe Investment Counsel, LLC*, 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015).
[132] *AM General Holdings LLC*, 2016 WL 4440476, at *11-12.
[133] Ocimum raised the continuous contract doctrine at the motion to dismiss stage. At that time, the Court concluded the record was not sufficiently developed to rule on the applicability of the

AstraZeneca has continued to breach Sections 6.1(c) and 6.3 of the 2001 Agreement by using Ocimum's trade secrets internally and with third party collaborators.[134] But that is not a proper application of the continuing breach doctrine. If a plaintiff could allege a prima facie case for breach of contract after a single incident, the doctrine does not apply, even if a defendant engages in "numerous repeated wrongs of similar, if not same, character over an extended period."[135] Therefore, the fact that AstraZeneca continued to retain or use Ocimum's trade secrets does not alter when the breach of contract claim accrued because Ocimum could have alleged a claim after the initial breach.

### F. Ocimum's other claims also are time barred.

Because Ocimum was aware by July 2012 of facts indicating AstraZeneca improperly retained data after the 2001 Agreement's termination, Ocimum also was on inquiry notice of all other potential claims premised on the same factual basis.[136]

---

continuous contract doctrine to this case. *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, Dec. 29, 2016 Opinion at 33–35 (Trans. ID 60005499) (currently under seal). The record now is developed, however, and it is plain that Ocimum could have alleged a breach of contract claim after AstraZeneca's initial breach of the 2001 Agreement.

[134] Ocimum Resp. at 65-66.

[135] *Price v. Wilm. Trust Co.*, 1995 WL 317017, at *2-3 (Del. Ch. May 19, 1995).

[136] *Certainteed*, 2005 WL 217032, at *11 (Plaintiff had reason to suspect two very serious contractual breaches and therefore could not fail to act with diligence as to other possible breaches); *In re Nine Sys. Corp. S'holder Litig.*, 2013 WL 4013306, at *11 (Del. Ch. July 31, 2013) (plaintiffs' inquiry notice as to one element of wrongdoing relating to stock options placed it on inquiry notice of "any wrongdoing relating to the options" that may have occurred in that period because had plaintiffs investigated the known incident of wrongdoing, they would have discovered the other incidents.).

Ocimum's unjust enrichment claim, along with its trade secret claim, all arise from the same alleged misconduct: AstraZeneca's improper use and retention of Ocimum's intellectual property. A plaintiff may not circumvent the statute of limitations by asserting other claims based on the same factual predicate that underlies an untimely claim.

It is irrelevant that Ocimum might not have appreciated that AstraZeneca's retention and use of the data constituted a misappropriation of trade secrets, as opposed to a breach of contract. Ocimum was aware of the facts that could give rise to the trade secret claim, and that is all that inquiry notice requires.[137] In *VLIW Technology, LLC v. Hewlett-Packard Co.*, the Court of Chancery explained that "[t]he cause of action accrues when the claimant knows or should know the relevant *facts*," not when the claimant knows the "legal[] basis for the cause of action."[138] As in *VLIW*, because the facts underlying both the contract claim and trade secret claim were the same, the conclusion that the plaintiff was on inquiry notice of the contract claim extends with equal force to Ocimum's trade secret and unjust enrichment claims.[139]

In an attempt to preserve at least some of its claims, Ocimum argues the statute of limitations does not bar claims based on (1) misconduct that occurred after August

---

[137] *VLIW*, 2005 WL 1089027, at *13-14.
[138] *Id.* at *13.
[139] *Id.* at *13, 15.

21, 2012, (2) "undisclosed" trade secret misappropriation, including misappropriation of Ocimum's database architecture, toxicology models, and pathology images, or (3) AstraZeneca's past or continuing use of Ocimum's trade secrets with third party collaborators since Ocimum was not aware of those collaborations before discovery in this case. To the extent these arguments go to Ocimum's continuing contract theory, they are discussed and rejected above.[140] To the extent these arguments go to Ocimum's trade secret claims, Ocimum's contentions misapprehend the nature of a trade secret claim and misstate Delaware law.

Under 6 *Del. C.* § 2006, a "continuing misappropriation constitutes a single claim" that accrues when the misappropriation reasonably could be discovered.[141] That "single claim" rule means a plaintiff may not bring separate trade secret claims for each use of the same trade secret, and the single claim accures when the misappropriation was or could have been discovered.[142] Ocimum's trade secret claim accrued no later than July 2012, when Ocimum was or should have been

---

[140] *See* Section II(E), *infra.*

[141] 6 *Del. C.* § 2006.

[142] *Id.*; *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 525 (N.D. Cal. 2000) (quoting *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 653-54 (N.D. Cal. 1993)) (quoting an identical statutory provision and explaining that the language "reflects a rejection of the continuing wrong theory (i.e., rejection of the idea that each subsequent act of misappropriation of a trade secret creates a new claim for a plaintiff and begins a new period of limitations).") (internal quotations omitted). Because Delaware has adopted the Uniform Trade Secret Act (UTSA), it looks to other UTSA states' decisions for guidance. *See VLIW*, 2005 WL 1089027, at *13 n.56.

suspicious that AstraZeneca wrongfully retained Ocimum's data. Accordingly, all claims based on that misappropriation are untimely, even those based on AstraZeneca's continued use of the data after August 21, 2012. Moreover, just as in non-trade secret cases, Ocimum's inquiry notice as to one trade secret claim should have alerted it to the risk that AstraZeneca misappropriated additional trade secrets shared under the same confidential relationship.[143] Here, Ocimum shared all the allegedly misappropriated trade secrets under the same contractual relationship, and all Ocimum's trade secret claims therefore are barred under Section 2006, including those based on AstraZeneca's collaborations with third parties or alleged misappropriation of Ocimum's database architecture, toxicology models, and pathology images.

### III. CONCLUSION

For the foregoing reasons, AstraZeneca's motion for summary judgment based on the statute of limitations is **GRANTED** as to all the claims remaining in this case. The trial scheduled to begin on January 21, 2020 shall be removed from the calendar. The parties' remaining summary judgment motions and motions regarding the admissibility of expert testimony are **MOOT**. Ocimum's outstanding motion for sanctions shall be resolved by the special master who presently is

---

[143] *Intermedics*, 822 F. Supp. 634, 654, 657 (N.D. Cal. 1993); *see also Certainteed*, 2005 WL 217032, at *11.

38

considering that motion. The parties shall forward a copy of this opinion to the special master.

**IT IS SO ORDERED.**