Richard COLEMAN, Carl Sledz, Marietta Dennis, Steven Coleman and Shane Lynagh, Plaintiffs Below, Appellants,

v.

PRICEWATERHOUSECOOPERS, LLC, Defendant Below, Appellee.

No. 589,2003.

Supreme Court of Delaware.

Submitted: April 7, 2004.
Decided: July 16, 2004.

Kevin William Gibson, Esquire, of Gibson & Perkins P.C., Wilmington, Delaware; Attorneys for Appellants.

Gregory V. Varallo, Esquire, and Lisa M. Zwally, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Of Counsel: Martin L. Perschetz, Esquire, and Joanna Goldenstein, Esquire, of Schulte Roth & Zabel, New York, New York; Attorneys for Appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

JACOBS, Justice.

The plaintiffs, who are former owners of Digital Imaging & Technologies, Inc. ("DIT"), sold that firm to Lason, Inc. ("Lason"), a company later found to have engaged in fraudulent accounting practices. At the closing of the sale of DIT, Lason paid only a portion of the purchase price. Because Lason thereafter filed for bankruptcy, it became unable to pay the balance of the purchase price. Accordingly, the plaintiffs sued Lason's public accounting firm, defendant PricewaterhouseCoopers, LLC ("PWC"), in the Superior Court on February 21, 2003.

The plaintiffs claimed that PWC had negligently failed to uncover the fraud during its audit of Lason's financial statements, upon which the plaintiffs had relied before agreeing to the sale of DIT. The defendant, PWC, defended on the ground that the accounting malpractice claim was barred by the three-year statute of limitations. The basis for that defense was an e-mail sent to the plaintiffs on January 6, 1999. That e-mail (PWC claimed) put the plaintiffs on inquiry notice of a possible claim against PWC, and that as a consequence, the statute of limitations began to run on January 6, 1999. The Superior Court accepted this argument and granted PWC's motion for summary judgment on limitations grounds. We conclude that the Superior Court erred and that its grant of summary judgment must be reversed.

## I. *Facts*

The plaintiffs below-appellants, Richard Coleman, Carl Sledz, Marietta Dennis, Steven Coleman, and Shane Lynagh (the "plaintiffs"), incorporated DIT in 1990 to engage in the business of providing data/image capture for customers. During the 1990s, Lason also developed a data/image capture capability; and between 1996 and 1999, Lason acquired numerous independent data/image capture companies in an effort to compete successfully in that market. In 1998, the plaintiffs, as owners of DIT, were approached by Lason executives, who proposed that Lason acquire DIT. After negotiations, the parties signed a letter of intent and began their due diligence investigation.

Defendant below-appellee PWC, a public accounting firm, had performed the due diligence work for Lason in most of Lason's acquisitions. Moreover, PWC had prepared Lason's Annual Report, SEC forms 10–K and 10–Q, and Lason's audited and unaudited financial statements for the periods ending December 31, 1997 and September 30, 1998. The plaintiffs reviewed, and relied upon, those financial statements before deciding to go forward with the sale of DIT to Lason. In addition, before finalizing the acquisition, the plaintiffs met personally with PWC representative, Timothy Molnar, CPA, to review the financial documents. At that meeting, the plaintiffs specifically asked Molnar whether there was "anything else" they should know about the financial condition of Lason. Molnar reassured them that the documents they had been furnished presented an accurate picture of Lason's financial condition.

The parties' letter of intent, which was signed during the summer of 1998, recited that the base purchase price to be paid for one hundred percent (100%) of DIT's outstanding stock would be $18 million, less existing debt, plus an "earn out" formula tied to DIT's future EBITDA. The base purchase price was to be paid eighty-five percent (85%) in cash and fifteen percent (15%) in Lason stock.[1] The merger was consummated on November 25, 1998. On that date, the plaintiffs received $6.5 million, with the balance to be paid over three years.

Shortly before the merger closed, DIT renegotiated the terms of an outstanding $1.9 million loan. As renegotiated, that debt would be satisfied by DIT paying a lump sum of $1.1 million out of the proceeds of the merger. The result was an $800,000 forgiveness of debt. That amount was accounted for as an "accrued expense" on DIT's records.

After the closing, there were communications between DIT and Lason executives, including several e-mails that were sent in connection with making the opening balance sheet adjustments. In one of those e-mails, Lason's assistant comptroller, Robert Bassman, wrote to DIT's Chief Financial Officer, Al Lydon, on January 6, 1999. Bassman's January 6, 1999 e-mail stated, in relevant part:

> [N]ote the $800,000 posted to "accrued expenses". this is the extraordinary gain relating to the forgiveness of a portion of the OPIC note payable. proper GAAP would be to record the entire amount as reduction of goodwill. however, i have elected an aggressive accounting approach in order to create more tail wind and cushion for 1999.
>
> take $400,000 of the $800,000 and record into income in December. i don't really care where you put it so long as it is not obvious to the auditors should they look at your numbers. the remainder we will save for a rainy day in 1999.

Upon receiving that e-mail, Mr. Lydon became concerned about the propriety of Bassman's instruction. Lydon notified plaintiff Coleman, who in turn contacted Lason's Chief Executive Officer, Gary Monroe, and asked for an explanation. Responding to Coleman, Monroe apologized for the wording of the e-mail, and assured Coleman that the accounting for the transaction would have PWC's blessing. Having been thus reassured, Cole-

---

1. According to the complaint, after PWC completed its due diligence, that purchase price was renegotiated down to $13 million, with "earn-out" potential (structured as a repurchase of the former DIT owners' Lason stock by Lason) of $25 million over the three-year period following the merger. Appellants' Appendix, at A000013, ¶ 55. Whether or not that in fact occurred is not material to our disposition of this appeal.

man told Mr. Lydon to make the accounting adjustment as instructed in the January 6, 1999 e-mail.

By December 1999, Lason's stock price had significantly fallen. On December 9, 1999, Monroe issued a public announcement which stated that "[w]e are not aware of any reason for Lason's share price decline." On December 17, 1999, Monroe initiated a conference call with the plaintiffs and others who had sold their businesses to Lason. In that conference call, Monroe assured them that despite the decline in Lason's share price, Lason's financial condition was strong. By the next trading day, however, Lason's common stock had fallen from a high (for that year) of $64.94 per share on February 1, 1999, down to $11.88 per share on December 20, 1999.

In May 2000, Lason informed the plaintiffs and the other persons who had sold their businesses to Lason, that Lason was reviewing the "current circumstances of each [earn out] agreement and relationship." By June 2000, Coleman and Lydon became so concerned about Lason's "troubling" business practices that they flew to Detroit from San Diego to meet with a newly-appointed, independent Lason director, Bill Brooks. Mr. Brooks advised the plaintiffs that he would "check things out" and get back to them, but he never did.

In July 2000, Lason's board of directors commenced an internal investigation into possible accounting irregularities at Lason. The Lason board appointed a "Special Committee," which retained legal counsel and initially retained PWC to investigate the irregularities. After eight months of investigation, on March 23, 2001, the Special Committee caused a Form 8K to be filed with the Securities and Exchange Commission ("SEC"). The Form 8K disclosed significant accounting irregularities in earlier Lason financial statements.

On December 5, 2001, Lason filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. Later, Lason's Chief Executive, Financial and Operating Officers were all indicted for securities fraud.

The plaintiffs filed this action against PWC on February 21, 2003, claiming accounting malpractice and negligent misrepresentation. Their specific claim was that if PWC had audited Lason's financial statements properly, Lason's accounting irregularities and its nonconformity with generally accepted accounting principles (GAAP) would have been discovered, and no sale of DIT to Lason would ever have occurred.

In granting PWC's motion for summary judgment, the Superior Court held that the January 6, 1999 e-mail directing Lydon to make the $800,000 adjustment was sufficient to put the plaintiffs on notice of potential problems between Lason and its auditor, PWC. As a consequence, the Court held, the plaintiffs should have investigated the matter further with PWC representatives; and had they done so, plaintiffs would have uncovered the facts underlying their claim before the three year limitations period expired on or about January 6, 2002.[2] Because the complaint was not filed until February 2003, the claim was time-barred.

## II. *Analysis*

■ This Court reviews a trial court's

---

**2.** *Coleman v. PricewaterhouseCoopers, LLP,* C.A. No. 03C–02–137, 2003 WL 22765851, at 19–20 (Del.Super.Ct. Nov. 18, 2003).

grant of summary judgment *de novo.*[3] Summary judgment is to be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[4]

The sole issue is whether the trial court properly determined, as a summary judgment matter, that this action was barred by the statute of limitations found at 10 *Del. C.* § 8106. Section 8106 pertinently provides that no action "shall be brought after the expiration of 3 years from the accruing of the cause of such action." Generally, a cause of action arising in tort "accrues" at the time the tort is committed. Under Section 8106, the period of limitations normally begins to run at the time of the wrongful act. Ignorance of the cause of action will not toll the statute, absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.[5] In the latter circumstance, the statute of limitations begins to run upon the discovery of facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of such facts.[6]

This Court has applied the above-described "discovery rule" in cases claiming accounting[7] and attorney[8] malpractice, because of the special character of the relationship between the professional and the client, and the inability of a layperson to detect the professional's negligence.[9] The application of that rule is necessarily based on the facts of each case.[10] No party disputes that this case implicates the discovery rule. The professional nature of the relationship between PWC and the plaintiffs; the plaintiffs' inability to acquire by other means, information about the accounting treatment of Lason's financial statements upon which the plaintiffs relied when DIT was acquired; and the need for persons in the plaintiffs' position to rely upon the accounting work performed by PWC, permit no other conclusion.

The question presented on this appeal is whether the January 6, 1999 e-mail was sufficient, as a matter of law, to put plaintiffs on inquiry notice of a potential claim that PWC had negligently failed to uncover Lason's improper accounting practices during its audit of Lason's 1997 and 1998 financial statements. This Court concludes that that question must be no, for two reasons. First, it is unclear, as a factual matter, whether or not the 1999 e-mail should have aroused the plaintiffs' suspicions to a degree sufficient to impose upon the plaintiffs a duty of further inquiry. Second, it is impossible to determine from the present record whether a more diligent investigation, even if pursued, would have uncovered facts sufficient to

3. *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831, 833 (Del.1992).

4. Super. Ct. Civ. R. 56(c), *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991).

5. *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* 330 A.2d 130, 132–33 (Del.1974) (citing *Mastellone v. Argo Oil Corp.,* 82 A.2d 379 (Del.1951), and *Layton v. Allen,* 246 A.2d 794 (Del.1968)).

6. *Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982).

7. *Isaacson,* 330 A.2d 130.

8. *Child, Inc. v. Rodgers,* 377 A.2d 374 (Del.Super.Ct.1977), *aff'd Pioneer Nat'l Title Ins. Co. v. Child, Inc.,* 401 A.2d 68, 72 (Del.1979).

9. *Isaacson, supra,* at 133.

10. *Id.*

enable the plaintiffs to discover the basis of their accounting malpractice claim.

■ With regard to the first issue, this Court cannot hold, as a matter of law, that the January 6, 1999 e-mail, by itself and without more, was sufficient to impose upon the plaintiffs a duty to conduct a further investigation. A person of ordinary intelligence and prudence could draw competing inferences from the statements made in that e-mail and from the response of Lason's CEO, Mr. Monroe, to the plaintiffs' follow-up inquiry. The plaintiffs testified that Monroe led them to believe that PWC would be informed of the e-mail, and that PWC would approve of the accounting treatment described therein. Moreover, Messrs. Coleman and Lydon (both of whom were certified as accountants), and expert witness William N. Easton, III, CPA, all testified that the entries were in the "gray area" of accounting and were not *per se* forbidden under GAAP. Additionally, Mr. Easton's affidavit states that the January 6, 1999 e-mail would not, "in and of itself" arouse him "to be suspicious of the accounting practices of Lason."

Thus, there was no "red flag" that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire whether PWC had negligently failed to determine that Lason's pre-acquisition accounting practices violated GAAP. To be sure, an inference to that effect could be drawn; however, opposite inferences could be drawn as well. The issue, therefore, is clearly one of disputed fact, the resolution of which requires a trial. The trial court erred in concluding, as a matter of law, that the plaintiffs' receipt of the January 6, 1999 e-mail placed them on inquiry notice.

■ The trial court also erred in granting summary judgment to PWC for a second reason. Assuming without deciding that the plaintiffs were on inquiry notice, it cannot be determined, on the present record, whether a diligent inquiry by plaintiffs would have uncovered facts sufficient for them to assert an accounting malpractice claim. Upon receiving the January 6, 1999 e-mail, the plaintiffs did, in fact, immediately inquire into its contents. DIT's CEO contacted Lason's CEO, Mr. Monroe, and expressed to him their concerns. Monroe, however, gave the plaintiffs false reassurances, and misleadingly failed to give them accurate information regarding the much-later-discovered accounting irregularities at Lason. Indeed, even the Special Committee of the Lason board, which (unlike the plaintiffs) had full access to Lason's books and records, required eight months to uncover the accounting irregularities after commencing its internal investigation. Insofar as the record discloses, the plaintiffs' access to information was limited to those Lason executives who were later indicted for securities fraud.

Those facts alone preclude a determination *as a matter of law* that a more diligent inquiry by plaintiffs would have enabled them to uncover the irregularities between January 1999 and January 2002. Thus, it was error to conclude, *as a matter of law*, that a diligent inquiry by these plaintiffs, beginning in 1999, would have revealed facts that would have enabled them to bring their malpractice cause of action within the three year limitations period. That issue must also be resolved at trial.

For these reasons, the order of the Superior Court granting summary judgment to PWC is reversed.