Paul H. **BOERGER**, Apartment Managers, Inc., and Alban Park, Inc., Plaintiffs Below, Appellants,

v.

Henry A. **HEIMAN**, Esquire, Darrell J. Baker, Esquire, Heiman Aber & Goldlust, including its Successors, Keith L. Thompson and Ballard, Thompson and Associates, P.A., Defendants Below, Appellees.

Henry A. Heiman, Esquire, Darrell J. Baker, Esquire, Heiman Aber & Goldlust, Third Party Plaintiffs Below, Appellees,

v.

**Patone & Patone, LLC,** Third Party Defendants Below, Appellees.

No. 92, 2008.

Supreme Court of Delaware.

Submitted: Nov. 12, 2008.
Decided: Feb. 9, 2009.

---

Bruce W. McCullough, Esquire, of Bodell, Bové, Grace & Van Horn, P.C., Wilmington, Delaware; Of Counsel: Jeffrey W. Ogren, Esquire, (argued), George Bochetto, Esquire, and Steve Skovron, Esquire of Bochetto & Lentz, P.C., Philadelphia, Pennsylvania for Appellants.

Colleen D. Shields, Esquire, (argued) of Elzufon Austin Reardon Tarlov & Mondell, P.A., Wilmington, Delaware for Appellees Henry A. Heiman, Esquire, Darrell J. Baker, Esquire and Heiman Aber & Goldlust.

Paul Cottrell, Esquire (argued) and Justin P. Callaway, Esquire of Tighe & Cottrell, P.A., Wilmington, Delaware, for Appellees Keith L. Thompson and Ballard, Thompson & Associates, P.A.

Henry E. Gallagher, Jr., Esquire and Gregory J. Weinig, Esquire of Connolly, Bove, Lodge & Hutz, LLP, Wilmington, Delaware for Appellees Patone & Patone, LLC.

Before HOLLAND, BERGER and RIDGELY, Justices.

BERGER, Justice.

In this appeal we consider whether the Superior Court erred in granting summary judgment to appellees in a professional malpractice action. The trial court held that appellants were on inquiry notice of the alleged malpractice more than three years before they filed suit, and that their claim is barred by the statute of limitations. The court reached its conclusion after evaluating conflicting evidence and making factual findings adverse to appellants. Summary judgment may not be granted where, as here, there are material issues of fact in dispute. The question of whether the statute of limitations bars this claim must be decided at trial, and the decision of the Superior Court must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

In the 1980's, Paul H. Boerger purchased two apartment complexes—Village of Windhover Apartments and Canby Park Apartments. Boerger retained attorneys, Henry Heiman, Esquire, Darrell J. Baker, Esquire, and Heiman, Aber & Goldlust (collectively, "Heiman"), and accountants, Keith L. Thompson and Ballard, Thompson and Associates, P.A. (collectively, "Thompson"), to assist him with legal and financial matters relating to the apartments. In 1997, Boerger was facing serious cash-flow problems, and decided to refinance the mortgages on the two apartments. After selecting GMAC Commercial Mortgage Corporation ("GMAC") as the new lender, Boerger instructed Heiman to work out the details. Because GMAC would only provide mortgage financing to an entity, Heiman created Village of Windhover, LLC ("LLC"), and two corporations—Apartment Managers, Inc. ("AMI") and Alban Park, Inc. ("API").

Boerger had known since the 1970's that if he owned property as a corporation, he would be subject to double taxation. When Heiman created the new entities, he instructed Boerger to transfer the two apartments to LLC. Heiman explained that Boerger would own 99% of LLC and AMI would own the remaining 1%. Heiman also explained that, because the properties were owned by LLC, all profits and losses would pass through to Boerger without double taxation.

Apparently because of changes required by GMAC, the restructuring was not accomplished exactly as Heiman had anticipated. Instead of directly owning 99% of LLC, Boerger became the sole owner of the two corporations, API and AMI, which respectively owned 99% and 1% of LLC. Boerger asked Heiman whether the modified restructuring would have adverse tax consequences, and Heiman assured Boerger that it would not. That statement might have been accurate if, before March 15, 1998, API and AMI had filed Form 2553 with the Internal Revenue Service, to obtain Subchapter S status. But neither Heiman nor Thompson made the required filing.

In the summer of 1999, Boerger met with a new accountant, Pamela Patone, to prepare his taxes. Patone recalls telling Boerger that, because the two corporations

had not elected Subchapter S status, he would be taxed on the personal and corporate level if the corporations generated net income. At that point the corporations were generating losses, but she says she told Boerger that he should elect Subchapter S status when the corporations became profitable. Boerger claims that Patone only told him that it might make sense to convert to Subchapter S status in the future, and that she did not discuss the benefits of Subchapter S status or otherwise alert him to the problem he discovered when he attempted to sell one of the apartments.

In 2004, Boerger received an offer to buy Village of Windhover apartments for $26 million. In response to the offer, Boerger asked Patone about the tax implications of such a sale. She advised that, because of the corporate structure, he would be subject to double taxation on the capital gains from the sale. Patone testified that she never mentioned the double taxation of capital gains in prior years, during the discussions about the possibility of electing Subchapter S status in the future. Although she realized that a sale would result in double taxation, Patone did not mention it because she was not aware the Boerger was considering selling his property.

Boerger decided not to sell the property after Robert Gorman, an attorney and CPA, confirmed the fact that he would suffer double taxation. Gorman advised Boerger that he could avoid the tax problem by electing Subchapter S status and then holding the property for another 10 years. In January 2005, Boerger filed this action against Heiman, Thompson, and Patone, alleging breach of contract, profes-

sional negligence, and negligent misrepresentation arising from the failure to elect Subchapter S status. Heiman and Thompson filed third party complaints against Patone and her business, Patone & Patone, LLC. After discovery was concluded all defendants moved for summary judgment, on various grounds, including the expiration of the applicable statute of limitations. The Superior Court granted the motions in two decisions. The first addressed the negligence and contract claims, and the second addressed the remaining claim for declaratory relief. This appeal followed.

## DISCUSSION

■■■■ We review the trial court's grant of summary judgment *de novo.*[1] In evaluating the record, we must determine whether, viewing the facts in the light most favorable to Boerger, there are no material issues of fact in dispute and Heiman, Thompson and Patone are entitled to judgment as a matter of law.[2] The governing law is well settled:

> Generally, a cause of action in tort "accrues" at the time the tort is committed.... Ignorance of the cause of action will not toll the statute [of limitations], absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act.... In the latter circumstance, the statute of limitations begins to run upon the discovery of facts "constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of such facts.[3]

---

**1.** *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831 (Del.1992).

**2.** *Reddy v. MBKS Company Ltd.,* 945 A.2d 1080, 1086 (Del.2008).

**3.** *Coleman v. Pricewaterhousecoopers, LLC,* 854 A.2d 838, 842 (Del.2004). (Citation omitted.)

The sole issue on appeal is whether the trial court correctly determined that the statute of limitations began to run more than three years before Boerger filed suit.[4]

■ The parties agree that the "time of discovery" rule applies, but disagree on the point at which Boerger was on "inquiry notice" that Heiman and/or Thompson had committed malpractice with respect to his tax liabilities. The Superior Court found that Boerger knew about, or should have discovered, his liability for double taxation no later than 1999. The trial court noted that Boerger knew about the double taxation problem associated with corporate ownership since the 1970's. In addition, Boerger questioned Heiman about the creation of LLC and its tax implications in 1997. Finally, the court found that, in 1999, Patone asked Boerger why he had not elected Subchapter S status. From these facts, the trial court concluded that Boerger was on notice of potential tax problems more than three years before he filed suit in 2005.

In reaching its conclusion, the trial court inappropriately resolved disputed issues of fact. Viewing the facts in the light most favorable to Boerger, there was "no 'red flag' that clearly and unmistakably would have led a prudent person to inquire whether [Heiman or Thompson] negligently failed to [restructure his business in a way that would avoid double taxation.]"[5] It is true that Boerger was aware of the double taxation issue, but, the two properties were transferred to LLC, not the corporations. Boerger asked Heiman whether API and AMI's ownership of LLC would create tax problems, and he was assured that "the whole thing was safe," and that his tax liability would not change as a result of the restructuring. According to Boerger, he and his attorneys discussed this issue "many times" and he was always told that there would be no double taxation.

Boerger also discussed tax issues with Patone, but their recollections of what was said are not entirely consistent. Patone testified that, when she started preparing his tax returns in 1999, she told Boerger that the Subchapter S election should have been made when the two corporations were formed. Boerger does not agree that he was told that he should have elected Subchapter S status at the outset. Rather, he said he was told that it would make sense to elect Subchapter S status at some future time, when the corporations started showing a profit. Since the corporations were reporting losses, Patone advised Boerger that, if he elected Subchapter S he might not be able to use those losses to offset other income. Patone discussed this with Boerger every year, and told him that he should make the Subchapter S election when the corporations started showing a profit. Patone acknowledges that she never advised Boerger about the tax implications of selling the apartments.

From these record facts, one could conclude that Boerger had no reason to question the manner in which Heiman accomplished the restructuring until he received an offer to buy Village of Windhover in 2004, and learned the tax consequences of such a sale. Heiman had told him that there would be no double taxation. Patone told him that he should consider electing Subchapter S status in the year that the

4. Heiman contends that this appeal was untimely because Boerger failed to appeal the first of the trial court's two decisions within 30 days after that decision was docketed. This argument lacks merit, as the first decision was interlocutory. See: 10 Del. C. § 144.

5. Id. at 843.

corporations showed a profit. A reasonable person, given that advice, might assume that the double taxation was not a problem, as it could be avoided by electing Subchapter S status. Indeed, rather than being alerted to a possible problem, Boerger could have believed that he had the "best of both worlds." By not electing Subchapter S status immediately, he could use the corporations' losses to offset other gains. Then, whenever the corporations started showing a profit, he could elect Subchapter S status and avoid double taxation.

In sum, the record does not support only one conclusion on the question of whether a prudent person of ordinary intelligence would have been alerted to the possibility of a tax problem. Accordingly, the trial court erred in granting summary judgment on this ground. The Superior Court did not address other claims advanced in support of the motions for summary judgment, and this Court will not consider them for the first time on appeal.

## CONCLUSION

Based on the foregoing, the judgment of the Superior Court is reversed and this matter is remanded for further action in accordance with this decision. Jurisdiction is not retained.