# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BRIGHTHOUSE LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | C.A. No. N18C-04-028 PAW |
| GERONTA FUNDING, a Delaware statutory trust, | ) ) ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

Submitted: May 3, 2023
Decided: August 3, 2023

## <u>OPINION</u>

*On Remand from the August 25, 2022 Opinion
of the Supreme Court of the State of Delaware*

Gregory F. Fischer, Esq.; Joseph Kelleher, Esq., Pro Hac Vice; and Brian D. Burack, Esq., Pro Hac Vice, of COZEN O'CONNOR, *Attorneys for Plaintiff/Counterclaim Defendant*.

Andrew S. Dupre, Esq.; Steven P. Wood, Esq.; and Travis J. Ferguson, Esq., of MCCARTER & ENGLISH LLP, *Attorneys for Defendant/Counterclaim Plaintiff*.

**Winston, J.**

## I. INTRODUCTION

This civil action involves whether premiums paid on a life insurance policy declared void *ab initio* for lack of an insurable interest should be returned. Presently, the matter is back before the Court on remand from the Delaware Supreme Court, who adopted a fault-based approach as framed by the Restatement (Second) of Contracts (the "Restatement") as the test to determine whether the premiums should be returned. The Delaware Supreme Court directed this Court to reconsider its factual findings under the newly adopted fault-based test, with specific consideration given to whether either party was on inquiry notice of the void nature of the policy. For the reasons set forth below, this Court finds Geronta Funding has proven entitlement to restitution of certain premiums paid.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

The facts of this case are set forth in this Court's decision after trial.[1] For the sake of brevity, the following recitation is limited to the facts essential to resolving the issues presented to this Court on remand.

### 1. The Seck Policy

On July 24, 2007, MetLife Investors USA Insurance Company ("MetLife")[2]

---

[1] *Brighthouse Life Ins. Co. v. Geronta Funding*, 2021 WL 4080672 (Del. Super. Ct. Aug. 20, 2021).

[2] Brighthouse is the successor to MetLife.

issued a $5 million life insurance policy to the Mansour Seck Irrevocable Life Insurance Trust (the "Seck Trust") insuring the life of a man named Mansour Seck (the "Seck Policy").[3] The beneficiary of the Seck Trust was Michael Seck whose listed address was 170 Academy Street, Suite B23 Jersey City, New Jersey.[4] Over the next two years, the Seck Trust paid $248,711.14 in premiums to MetLife.[5]

On July 24, 2009, the Seck Policy's two-year contestability period ended.[6] On or about August 10, 2009, the Seck Trust sold the Seck Policy to EEA Life Settlements, Inc. and its subsidiaries (collectively, "EEA").[7] Prior to purchase, neither EEA nor its investment advisor, ViaSource, attempted to determine if Mansour Seck was a real person, nor did they attempt to contact him.[8] After purchase, on January 25, 2010, EEA's investment advisor, ViaSource, attempted to contact Mansour Seck and his designated contacts.[9] Mail sent to Mansour Seck, however, came back marked, "returned to sender," and three of the Seck Policy's listed doctors stated Mansour Seck was not their patient.[10] The trustee of the Seck Trust, Sandor Krauss, similarly could not provide any contact information for

---

[3] *Brighthouse*, 2021 WL 4080672, at *1-2.
[4] *Id.* at *2; A558 (Third Amended Joint Pre-Trial Stipulation and Proposed Order ("Stip.") ¶ 16).
[5] *Brighthouse*, 2021 WL 4080672, *5.
[6] *Id.*
[7] *Id.*
[8] A566 (Stip. ¶¶ 59-61).
[9] A572 (Stip. ¶ 88).
[10] *Id.* ¶ 90.

Mansour Seck.[11]  This investigation led to EEA placing the Seck Policy on its "hard to track" list.[12]  ViaSource also performed two public records searches, one in October 2011 and another in December 2012,[13] which returned no results on a Mansour Seck with the Seck Policy's listed date of birth and Social Security Number.[14]  Nonetheless, EEA paid $706,478.29 in premiums until it sold the Seck Policy to Geronta.[15]

### 2.    MetLife's Investigation in Pape Seck

Two years after MetLife issued the Seck Policy, the Seck Trust beneficiary, Michael Seck, applied to MetLife to serve as the agent for three unrelated life insurance applications.[16]  In response, MetLife commenced an investigation into the insurance applications.[17]  The investigation included a public records search which revealed, *inter alia*, Pape Seck, also known as Pape Michael Seck, and Mansour Seck were possible relatives.  The address for the possible relative Mansour Seck was 170 Academy Street, Apt. B23, Jersey City, NJ.[18]  Due to the presence of Investor-Owned Life Insurance ("IOLI") flags and other irregularities, the

---

[11] *Id.* ¶ 91.
[12] *Brighthouse*, 2021 WL 4080672, at *8.
[13] *Id.*
[14] *Id.*
[15] *Id.* at *9.
[16] *Id.* at *6.
[17] A567 (Stip. ¶ 62).
[18] *Brighthouse*, 2021 WL 4080672, at *6.

4

applications were denied.[19]

After this investigation, MetLife also noticed the sale of the Seck Policy to EEA following the expiration of the contestability period. MetLife's Compliance Manager emailed Ms. Jean Phillip, a Senior Fraud Investigator, on December 17, 2009, regarding wire transfers with "strong IOLI flags."[20] The wire transfers related to the Seck Policy and revealed that ownership of the Seck Policy changed to EEA shortly after expiration of the contestability period.[21]

### 3.    Public Records Information About Pape Seck

Beginning in 2010, several press releases by the State of New Jersey and insurance industry publications informed the public that Pape Seck had been arrested and prosecuted for fraudulent insurance schemes.[22] On April 13, 2010, the Office of the New Jersey Attorney General ("NJAG") issued its first press release about Pape Seck, highlighting that Pape Seck had pled guilty to "two counts of insurance fraud in connection with his submissions, *as an agent*, … of fraudulent life insurance applications to Prudential Life Insurance Company and Aviva Life Insurance Company" (the "April 2010 Press Release").[23] The April 2010 Press Release noted that Pape Seck submitted false insurance applications on behalf of Mansour Seck,

---

[19] *Id.* at *7.
[20] *Id.* at *8; A571 (Stip. ¶ 84).
[21] *Brighthouse*, 2021 WL 4080672, at *8.
[22] *Id.* at *9.
[23] *Id*. (emphasis in original).

5

listing Pape Seck as the beneficiary under the polices.[24] The NJAG issued a second press release on June 8, 2010 (the "June 2010 Press Release") explaining that Pape Seck was sentenced to three years in state prison for submitting the false applications to Prudential and Aviva.[25] The June 2010 Press Release detailed that Pape Seck admitted no one by the name Mansour Seck applied for the life insurance policies.[26] He further conceded that he used identifying information from several people named Mansour Seck when filling out the applications.[27]

On April 26, 2010, the Office of the Insurance Fraud Prosecutor of the State of New Jersey (the "NJ Fraud Office") subpoenaed MetLife's Records concerning any and all life insurance policies for Mansour Seck.[28] On October 17, 2011, a third press release from the NJAG announced Pape Seck had pled guilty to knowingly making fraudulent or misleading statements including fraudulent pedigree, financial, and medical documentation in support of seven life insurance applications," one of which was the Seck Policy.[29] MetLife was thanked for its assistance in the investigation.[30] On October 26, 2011, Jim McCarthy, an investigator with MetLife's

---

[24] *Id.*
[25] A575-76 (Stip. ¶¶ 109-110).
[26] *Id.* (Stip. ¶ 111).
[27] *Id.* (Stip. ¶ 112).
[28] *Brighthouse*, 2021 WL 4080672, at *10. The following day, on April 27, 2010, Pape Seck was placed on MetLife's "do not appoint" list. A1429 at 53:15-20. On April 28, 2010, someone at MetLife printed out the April 2010 Press Release. A575 (Stip. ¶ 105).
[29] A580 (Stip. ¶¶ 128-130).
[30] *Id.* (Stip. ¶ 131).

6

Claims Investigation Unit, emailed MetLife's Field Investigation Unit for Corporate Ethics and Compliance to make them aware of Pape Seck's conviction (the "McCarthy Email").[31] This email included the names Mansour Seck and Pape Seck, the Seck Policy number, and the MetLife broker number.[32] The McCarthy Email also noted that MetLife cooperated in the investigation.[33]

### 4. *Geronta's Activities Surrounding the Seck Policy*

Geronta purchased the Seck Policy as part of a portfolio of 189 life insurance policies for approximately $130 million.[34] The terms of Geronta's purchase were set forth in the Life Insurance Portfolio Purchase and Sale Agreement, dated September 2, 2015, by and between Geronta Funding, as Purchaser, and EEA as Seller (the "P&S Agreement").[35] In the P&S Agreement, Geronta represented it had:

> such knowledge and experience both in financial, business and tax matters generally, and relating to the acquisition of in-force life insurance policies specifically, to enable it to identify, understand and independently evaluate the merits and risks of the purchase of the Policies and other Conveyed Property, the terms and conditions of this Agreement and each of the other Transaction Documents and the entry into and consummation of the transactions contemplated hereby and thereby. [36]

Geronta also acknowledged that it "had the opportunity to conduct its own

---

[31] A3034.
[32] *Id.*
[33] *Id.*
[34] *Brighthouse*, 2021 WL 4080672, at *10.
[35] *Id.* at *11.
[36] A584 (Stip. ¶ 152).

independent investigation of the Policies and the Conveyed Property."[37]

Prior to purchase, on or about June 2015, EEA provided Geronta access to a data room with information on the policies Geronta was purchasing.[38] Geronta did not review the information in the data room relating to the Seck Policy, nor did it conduct any independent research prior to purchasing the Seck Policy other than obtain confirmation from MetLife that the Seck Policy was in force.[39] After purchase, beginning in January 2016, Geronta attempted to update its records concerning the Seck Policy, but it could not obtain current information about Mansour Seck.[40] Geronta's initial investigation into the Seck Policy led Geronta to suspect something was amiss, and it ultimately concluded the Mansour Seck described in the Seck Policy did not exist by February 2017.[41] In April 2017, Geronta contacted Brighthouse and the parties began communicating about the Seck Policy and the premiums.[42]

### B.    PROCEDURAL HISTORY

After Geronta informed Brighthouse of its belief that Mansour Seck was fictitious, the parties unsuccessfully attempted to negotiate a resolution regarding

---

[37] *Id*. (Stip. ¶ 153).
[38] A2327 at 57:4-7; *Brighthouse*, 2021 WL 4080672, at *11.
[39] *Brighthouse*, 2021 WL 4080672, at *11.
[40] *Id.* at *12.
[41] *Id.*
[42] *Id.*

8

the return of all or part of the premiums.[43] Subsequently, in April 2018, Brighthouse filed a declaratory judgment action seeking a determination that it was entitled to keep all premiums paid on the Seck Policy.[44] After a bench trial, this Court concluded that Geronta had not proven it was entitled to restitution and declined to return the premiums to Geronta, except those premiums which Geronta paid after it notified Brighthouse the Seck Policy lacked an insurable interest in April 2017.[45]

Geronta appealed to the Delaware Supreme Court which adopted a fault-based test framed by Restatement Sections 197-199 to determine whether premiums paid on an insurance policy declared void for lack of an insurable interest should be returned.[46] Then, the matter was remanded so this Court could reconsider its factual findings in light of the newly adopted test.[47] This Court was directed to specifically consider whether either party had inquiry notice of the void nature of the Seck Policy.[48]

## III. DISCUSSION

Before turning to the issue of whether Geronta has met its burden of proving restitution under one of the Restatement's exceptions, two arguments, one raised by Brighthouse, the other raised by Geronta, must be addressed. First, Brighthouse

---

[43] *Id.*
[44] *Id.*
[45] *Id.* at *24.
[46] *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 71-72 (Del. 2022).
[47] *Id.* at 75.
[48] *Id.*

9

argues that for Geronta to prove an entitlement to restitution of the premiums paid, Geronta must prove the elements of unjust enrichment as well as one of the fault-based exceptions as set forth in Restatement Sections 197-199.[49]  Second, Geronta asks this Court to revisit its ruling that Brighthouse did not have *actual* knowledge that the Seck Policy lacked an insurable interest.[50]

### A. BRIGHTHOUSE'S UNJUST ENRICHMENT ARGUMENT FALLS OUTSIDE THE SCOPE OF THE SUPREME COURT'S REMAND

Turning first to Brighthouse's unjust enrichment argument, Brighthouse argues that, for Geronta to prove entitlement to the premiums paid, it must first prove the elements of unjust enrichment.[51]  Brighthouse contends, however, Geronta cannot prove unjust enrichment, as it has an adequate remedy at law against EEA to recover its losses on the Seck Policy.[52]  Geronta responds by asserting the scope of the Supreme Court's remand forecloses Brighthouse's attempt to relitigate the question of whether Geronta can and must prove unjust enrichment.[53]

This Court previously rejected Brighthouse's argument that Geronta must first prove the elements of the common law claim of unjust enrichment.  At the pretrial conference, this Court determined that a party has proven unjust enrichment if it can

---

[49] Brighthouse's Post-Trial Opening Br. at 19.
[50] Geronta's Post-Trial Opening Br. at 22-23.
[51] Brighthouse's Post-Trial Opening Br. at 19-21.
[52] *Id.*
[53] Geronta's Post-Trial Answering Br. at 5-8.

meet a Restatement exception.[54]  On appeal, Brighthouse argued that Geronta failed to prove the elements of unjust enrichment.[55]  Had the Delaware Supreme Court wished this Court to revisit its finding regarding the issue of whether Geronta must prove the elements of unjust enrichment *plus* a Restatement exception, it would have said so.  The Delaware Supreme Court's silence on this matter forecloses Brighthouse's attempt to relitigate the issue now.[56]  Accordingly, Brighthouse's argument falls outside of the scope of the Delaware Supreme Court's remand.

### B. BRIGHTHOUSE HAD ACTUAL KNOWLEDGE THE SECK POLICY WAS THE PRODUCT OF CRIMINAL FRAUD BY OCTOBER 2011.

This Court turns next to Geronta's request that this Court revisit its ruling regarding whether Brighthouse had actual knowledge the Seck Policy lacked an insurable interest prior to April 2017.  This Court previously concluded that the evidence failed to show Brighthouse had actual knowledge Mansour Seck was fictitious until notified by Geronta in 2017.[57]  As Geronta notes, this ruling has become law of the case and can only be considered if it is clearly wrong.[58]

---

[54] A847-848 at 9:23-10:4.

[55] *See* Brighthouse's Supplemental Br. at 4, n. 2.

[56] *Ins. Corp. of Am. v. Barker*, 628 A.2d 38, 40 (Del. 1993) ("On remand, "the trial court is bound to strictly comply with the appellate court's determination of any issues expressly or impliedly disposed of in its decision.").

[57] *Brighthouse*, 2021 WL 4080672, at *22 & n.208; *Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 WL 8198325, at *7, n.38 (Del. Super. Ct. Aug. 7, 2019) ("The evidence does not show that Brighthouse learned that the policy lacked an insurable interest until Geronta informed it in 2017 and, in fact, Brighthouse paid reinsurance premiums on the policy until 2017.").

[58] Geronta Post-Trial Opening Br. at 22-23.

11

This Court does not find its previous ruling to be clearly wrong; however, consistent with the Delaware Supreme Court's remand mandate regarding this Court's factual findings, this Court finds that by October 2011, Brighthouse had actual knowledge that Seck Policy was the product of a criminal fraud perpetuated by Pape Seck. By October 2011, the NJAG had released multiple press releases revealing Pape Seck had pled guilty to fraudulent insurance schemes using identifying information from multiple people named Mansour Seck and no one by the name Mansour Seck had ever applied for the policies. Further, the McCarthy Email demonstrates that, by October 2011, Brighthouse had discovered a connection between the Seck Policy and Pape Seck, and had actual knowledge the Seck Policy was the product of a criminal fraud perpetuated by Pape Seck. In short, while Brighthouse may not have had actual knowledge that the Mansour Seck described in the Seck Policy was fictitious, by October 2011, it did have actual knowledge the Seck Policy was procured fraudulently.

## C. BOTH BRIGHTHOUSE AND GERONTA WERE ON INQUIRY NOTICE

The Delaware Supreme Court specifically directed this Court to make a finding as to whether either party was on inquiry notice of the void nature of the Seck Policy.[59] As an answer to this question is necessary for the fault-based analysis framed by the Restatement, the Court turns to it now.

---

[59] *Geronta*, 284 A.3d at 75.

The question of inquiry notice turns on "whether [either] party had knowledge of facts tending to suggest the void nature of the policy."[60] "A party is deemed to have inquiry notice 'upon the discovery of facts constituting a basis for the cause of action, or [knowledge of] facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which if pursued, would lead to the discovery of such facts.'"[61] When considering whether a party possessed inquiry notice, "[t]he court should consider whether there were red flags that would have left a prudent person of ordinary intelligence to inquire further."[62] The Court considers whether each party was on inquiry notice in turn.

### D. BRIGHTHOUSE WAS ON INQUIRY NOTICE OF THE VOID NATURE OF THE POLICY NO LATER THAN APRIL 2010

Turning first to Brighthouse, Geronta argues Brighthouse was first on inquiry notice as early as December 17, 2009, when two Brighthouse investigators were

---

[60] *Id.* at 74.

[61] *Altenbaugh v. Benchmark Builders*, 2022 WL 176292, at \*2 (Del. 2022) (*quoting Wal-Mart v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)). Brighthouse contends that inquiry notice requires Geronta to show what a reasonable insurer in Brighthouse's position would have done. Brighthouse's Supplemental Br. at 9. Accordingly, Brighthouse contends Geronta's failure to present expert testimony on whether a prudent insurer would have inquired further under the same circumstances faced by Brighthouse means Geronta cannot show Brighthouse was on inquiry notice. *Id.* at 10. Suffice it to say, not even the cases cited by Brighthouse support the position that expert testimony is necessary to establish what constitutes inquiry notice for a particular party. The Court must, of course, consider a person of ordinary intelligence and prudence in the same circumstances as the party, but the issue of inquiry notice is decided by considering the facts known or readily available to the party and determining whether such information would lead a person of ordinary intelligence and prudence to inquire further. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319-320 (Del. 2004).

[62] *Id.* (*citing Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 842 (Del. 2004)).

alerted to the Seck Policy's sale to EEA shortly after the two-year contestability period ended.[63]  Geronta argues that even more red flags came to the attention of Brighthouse in April 2010.[64]  The first flag occurring when the NJAG issued the April 2010 Press Release, and then Brighthouse received the Subpoena from the NJ Fraud Office for all documents and information pertaining to the Seck Policy.[65]  Geronta notes that two days after receiving the Subpoena, someone at Brighthouse printed out the April 2010 Press Release and saved to its files.[66]  Thus, Geronta argues alternatively that Brighthouse had inquiry notice no later than April 28, 2010.[67]  Finally, Geronta argues that Brighthouse must have had inquiry notice by October 26, 2011.[68]  Geronta contends that, by this time, in addition to all the information listed above, Brighthouse learned that Pape Seck had pled guilty to multiple counts of insurance fraud, including for fraudulently securing the Seck Policy.[69]

---

[63] Geronta's Post-Trial Opening Br. at 17-18.  Geronta notes these same investigators were concurrently investigating the three unrelated life insurance applications submitted by Pape Seck in his capacity as an agent and whose investigation revealed a possible connection between Pape Seck and someone named Mansour Seck.

[64] *Id.* at 18.

[65] *Id.*

[66] *Id.*; A575 (Stip. ¶ 105).  Brighthouse also placed Pape Seck on its "Do Not Appoint" list on April 27, 2010.

[67] Geronta's Post-Trial Opening Br. at 20.

[68] *Id.* at 23.

[69] *Id.* at 21.

Brighthouse asserts that none of the information that came to its attention between 2009-2011 would have put a reasonable insurer on notice that Mansour Seck was fictitious.[70] With respect to Brighthouse's discovery that the Seck Policy was sold following the expiration of its two-year contestability period in December 2009, Brighthouse argues this fact alone does not suggest the Seck Policy insured a fictitious life.[71] Brighthouse points to the deposition of Vito Antonio DeCarlo,[72] who testified that assignment is a policy owner's right and something more would be needed to prompt an investigation by MetLife.[73] Next, Brighthouse contends the April 2010 Press Release would not have put it on inquiry notice that Mansour Seck was a fictitious person, as its "discussion of fraud does not make it sound like anything other than basic fraud, which an insurer cannot challenge after two years."[74] Finally, Brighthouse argues that both the October 2011 Press Release and the McCarthy Email do not suggest Mansour Seck was fake.[75]

This Court finds that Brighthouse had inquiry notice of the void nature of the Seck Policy no later than April 28, 2010. By that time, Brighthouse was in

---

[70] Brighthouse's Post-Trial Answering Br. at 7.
[71] *Id.* at 8.
[72] Mr. DeCarlo was the former vice president of MetLife's sales practice investigative unit. A2872 at 8:02-13.
[73] A2906-07 at 43:9-22.
[74] Brighthouse's Post-Trial Answering Br. at 14. Brighthouse relies here on the testimony of Ms. Julienne Warr, who was Chief Underwriter at the relevant time-period, and testified that her interpretation of the April 2010 Press Release was that Pape Seck was engaged in 'garden-variety' misrepresentations of health and wealth using altered documents. A1530 at 155:7-12.
[75] Brighthouse's Post-Trial Answering Br. at 14.

possession of the April 2010 Press Release, which notified the public of Pape Seck's conviction for insurance fraud and that he used identifying information from several people named Mansour Seck in submitting the false applications. Ms. Warr's testimony that this document suggested merely garden-variety wealth and health misrepresentations is belied by Pape Seck's own admission in the press release that no one by the name Mansour Seck applied for the policies.[76] Further, Brighthouse learned that the NJAG was investigating the Seck Policy.[77] Thus, by April 2010, Brighthouse knew that Pape Seck was fraudulently using identifying information from multiple people named Mansour Seck to commit insurance fraud; no one by the name of Mansour Seck had ever applied for the policies; and the Seck Policy was the subject of investigation by the NJ Fraud Office.[78] This Court finds that a person of ordinary intelligence and prudence, knowing this information, would have inquired further into whether the Mansour Seck described in the Seck Policy was a real, insurable person.

---

[76] Brighthouse argues the April 2010 Press Release suggests Mansour Seck is real, but perhaps had not been consulted on the life insurance application. Brighthouse's Post-Trial Answering Br. at 14. Whether a person named Mansour Seck exists was never the issue in this case. The issue was whether the Mansour Seck identified and described in the Seck Policy existed, and the April 2010 Press Release explicitly notes Pape Seck admitted to using the identifying information of multiple individuals named Mansour Seck to create a fictitious Mansour Seck.
[77] A575 (Stip. ¶ 103).
[78] A575 (Stip. ¶¶ 99-104).

### E.    GERONTA WAS ON INQUIRY NOTICE WHEN IT GAINED ACCESS TO THE DATA ROOM CREATED BY EEA APPROXIMATELY IN JUNE 2015

Geronta concedes, that by January 11, 2016, it became in possession of facts tending to suggest Mansour Seck was fictitious.[79]  Brighthouse contends, however, that Geronta was actually on inquiry notice before it elected to buy the Seck Policy.[80] Brighthouse's argument rests on the information in the data room created by EEA, which Geronta could access prior to purchase.[81]  Geronta does not contest that the data room contained facts sufficient to put a person of ordinary intelligence and prudence on inquiry notice; rather, it contends that inquiry notice requires *actual* notice of facts or circumstances that would lead a person of ordinary intelligence to investigate further.[82]  Thus, Geronta contends that, because it chose not to look at the information in the data room regarding the Seck Policy, it couldn't have been on inquiry notice.[83]

The concept of inquiry notice presumes a person of ordinary intelligence *and* prudence.[84]  Delaware courts have held that, when information is readily available, a party who ignores that information does so at their own peril.[85]  Geronta made a

---

[79] Geronta's Post-Trial Opening Br. at 26.

[80] Brighthouse's Post-Trial Opening Br. at 25.

[81] *Id.* at 25-27.

[82] Geronta's Post-Trial Answering Br. at 19.

[83] *Id.*

[84] *See Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010).

[85] *Id.* (holding that a plaintiff was on inquiry notice when he received an email referencing an environmental study which, had the plaintiff examined it, would have revealed the poor

deliberate, strategic decision not to examine the Seck Policy information contained in the data room. That decision was a calculated choice made by a sophisticated investor, and Geronta will have to bear the consequences of that choice. This Court finds that Geronta was on inquiry notice when the information regarding the Seck Policy was placed in the data room and Geronta gained access to it in June 2015.[86]

## F. GERONTA WAS LESS AT FAULT THAN BRIGHTHOUSE

Having concluded both parties were on inquiry notice, this Court must next undertake an analysis under the Delaware Supreme Court's fault-based test. The Delaware Supreme Court's test requires courts to analyze the exceptions outlined in Restatement Sections 197-199 and determine whether:

> (1) there would be a disproportionate forfeiture if the premiums are not returned; (2) the claimant is excusably ignorant; (3) the parties are not equally at fault; (4) the party seeking restitution did not engage in serious misconduct and withdrew before the invalid nature of the policy becomes effective; or (5) the party seeking restitution did not engage in serious misconduct, and restitution would put an end to the situation that is contrary to the public interest.[87]

With respect to Restatement Section 198, the Delaware Supreme Court explained courts should consider the following questions:

> whether the party knew the policy was void at purchase or later learned the policy was void; whether the party had knowledge of facts tending

---

environmental condition of the property); *In re Dean P'ship Litig.*, 2010 WL 363845, at *8 (Del. Ch. July 17, 1998) ("Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.").

[86] Geronta gained access to the data room approximately three months before it bought the policy. *See* A2327 at 57:4-7.

[87] *Geronta*, 284 A.3d at 72.

18

to suggest that the policy is void; whether the party procured the illegal policy; whether the party failed to notice red flags; and whether the investor's expertise in the industry should have caused him to know or suspect that there was a substantial risk that the policy it purchased was void.

The policy rationale underlying the fault-based test is twofold. First, it encourages insurers "to speak up when the circumstances suggest that a policy is void for lack of an insurable interest because they will not be able to retain premiums if they stay silent after being put on inquiry notice, and they might also be responsible for interest payments."[88] Second, it will "encourage investors to actually investigate all policies to avoid the risk of losing their premiums—a thorough investigation of insurance policies will hopefully uncover those that are void *ab initio* as against public policy."[89]

Geronta focuses primarily on its entitlement to the premiums under Restatement Section 198. Under Section 198, Geronta argues it was less at fault than Brighthouse. as Brighthouse had inquiry notice of the void nature of the Seck Policy since 2010; actual knowledge the Seck Policy was the product of criminal fraud since October 2011; and Brighthouse could have prevented Geronta from ever purchasing the Seck Policy.[90]

---

[88] *Id.*

[89] *Id*.

[90] Geronta's Post-Trial Opening Br. at 30-31. Geronta also argues, relying on *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059 (Del. 2011) that it is a member of a protected class. *Id.* at 29-30. This Court has reviewed *Price Dawe*, and finds no indication the Delaware Supreme Court intended or suggested sophisticated investors in

19

Brighthouse maintains that Geronta cannot prove entitlement to premiums under Section 198 because Geronta was not excusably ignorant and cannot show it was less at fault. Brighthouse elaborates that Geronta's failure to conduct any diligence on the Seck Policy prior to purchasing means the parties were, at the minimum, at equal fault.[91] Brighthouse further argues that since the Seck Policy had already past the two-year contestability period, and the law in New Jersey was unsettled as to whether a post-contestable challenge could be brought to invalidate policies lacking an insurable interest, then it cannot be faulted for its failure to investigate red flags raised in 2009-2011.[92] With respect to Section 197, Brighthouse argues returning the premiums to Geronta would undermine the Delaware Supreme Court's stated policy goal that investors in the life insurance settlement should conduct an investigation of insurance policies prior to purchase.[93]

An analysis under Restatement Section 198 requires the Court to determine whether: (1) Geronta was excusably ignorant; or (2) Geronta was not equally in the wrong with Brighthouse. With respect to whether Geronta was excusably ignorant, this Court reasserts its findings made in the decision after trial.[94] Geronta is a

___

the life insurance settlement market are members of a class public policy intended to protect.

[91] Brighthouse's other arguments rely on the notion that Brighthouse did not know Mansour Seck was fictitious until April 2017 when Geronta told them, however, because this Court has ruled Brighthouse was on inquiry notice of the void nature of the Seck Policy by April 2010, these arguments are inapplicable.

[92] Brighthouse's Post-Trial Opening Br. at 27-28.

[93] Brighthouse's Post-Trial Answering Br. at 26.

[94] Though Geronta does not make an argument under Section 198(a), Geronta's Post-Trial

sophisticated company in the life insurance investor market. It made the deliberate and strategic decision not to conduct diligence on the Seck Policy prior to purchase in order to potentially receive the death benefits without having to pay any premiums. "Had Geronta done its research, it would have seen circumstances that it might have considered problematic."[95] "A party is not excusably ignorant if it is willfully blind to the relevant facts."[96] Additionally, MetLife's underwriting process was reasonable and done in good faith.[97] Thus, Geronta was not excusably ignorant.

Next, this Court must decide whether Geronta was less at fault than Brighthouse. This Court concludes that it was. Though Brighthouse's underwriting process was reasonable, Brighthouse was on inquiry notice of the void nature of the policy more than five years prior to Geronta gaining access to the data room. As early as April 2010, had Brighthouse investigated the red flags related to the Seck Policy, it would have discovered Mansour Seck was fictitious and could have informed the policy holder of the void nature of the policy and stopped collecting premiums. Moreover, by October 2011, Brighthouse had actual knowledge the Seck

---

Answering Br. at 9, n.4, the *in pari delicto* analysis in Section 198(b) encompasses the questions relevant to 198(a). *See Geronta*, 284 A.3d at 69-70.

[95] *Brighthouse*, 2021 WL 4080672, at *20.

[96] *Geronta*, 284 A.3d at 69.

[97] *Brighthouse*, 2021 WL 4080672, at *20. To the extent Geronta is asking this Court to revisit its factual findings in respect to MetLife's underwriting process, *see* Geronta's Post-Trial Opening Br. at 4-5, this Court concludes such a request is outside the scope of the Delaware Supreme Court's remand. In any event, Geronta has again failed to show MetLife's underwriting process was unreasonable or done in bad faith.

Policy was the product of criminal fraud, yet Brighthouse continued collecting premiums. Further, one of the policy rationales underlying the fault-based approach is to incentivize insurers to speak up when they are on notice that a policy may lack an insurable interest. If this Court were to conclude the parties here are at equal fault, then an insurer would not be incentivized to speak up when it suspects a policy lacks an insurable interest, but only to wait and see if the policy is sold on the secondary market to an investor who does not conduct any pre-acquisition diligence.

In an effort to justify its inaction in the presence of several red flags tending to suggest the Seck Policy was void for lack of an insurable interest and having actual knowledge the Seck Policy was the product of criminal fraud, Brighthouse compares its conduct with that of the insurer, Sun Life, in the Seventh Circuit case *Sun Life v. Wells Fargo* (hereinafter "*Corwell*"). In *Corwell*, the Seventh Circuit found that, while Sun Life knew the STOLI policy was premium financed, that discovery did not necessarily make the policy illegal as a matter of law.[98] Importantly, however, the Seventh Circuit also noted "Sun Life did not know in 2009 about the broader scheme involving Coventry and AIG that was behind Corwell's policy from the beginning, which is the root of the illegal nature of this policy."[99] In other words, Sun Life was not in possession of facts in 2009 which would have led

---

[98] *Sun Life v. Wells Fargo*, 44 F.4th 1024, 1039, n.5 (7th Cir. 2022).
[99] *Id*.

to suspect the policy was void *ab initio*. This Court has already rejected Geronta's argument that in 2009 Brighthouse was on inquiry notice because it flagged the sale of the Seck Policy following the expiration of the contestability period. As noted, that fact alone, similar to Sun Life being aware the policy was financed by a non-recourse loan in *Corwell*, does not indicate the Seck Policy was void *ab initio*. However, by April 2010, Brighthouse was in possession of multiple facts which would have led a reasonably prudent insurer to investigate the whether the Mansour Seck in the Seck Policy was a real, insurable person. The Court concludes that, under Restatement Section 198, Geronta was less at fault than Brighthouse and awards Geronta the premiums it paid on the policy, plus interest.[100]

### G. GERONTA HAS FAILED TO PROVE IT IS ENTITLED TO PREMIUMS PAID BY EEA

In this Court's view, the Delaware Supreme Court's opinion in *Wilmington Trust, Nat'l Assoc. v. Sun Life Assurance Co. of Canada* (hereinafter "*De Bourbon and Frankel*"), indicates that for Geronta to recover the premiums paid by EEA, it must separately prove EEA is entitled to restitution under the fault-based approach.[101]

---

[100] Because this Court finds Geronta has met its burden of proving entitlement to the premiums it paid under Restatement Section 198, this Court declines rule on whether Geronta has proven an its entitlement to restitution of the premiums it paid under Restatement Sections 197 and 199.

[101] *Wilmington Trust, Nat'l Assoc. v. Sun Life Assurance Co. of Canada*, 2023 WL 2564350, at *9-11 (Del. Mar. 20, 2023) ("The question remains: To what extent, if any, is Wilmington Trust entitled to the return of premiums it and others before it paid? [. . .] Whether Wilmington Trust can prove that all or some of the former owners were less at fault than Sun Life is for the Superior

23

Brighthouse contends that Geronta cannot recover the premiums paid by EEA because it cannot prove EEA was less at fault.[102] First, Brighthouse notes the trial record is devoid any pre-acquisition diligence conducted by EEA.[103] Second, EEA ignored multiple red flags that came to its attention between 2009 and 2012 tending to suggest the Mansour Seck described in the Seck Policy did not exist.[104] Geronta argues Brighthouse is more at fault than EEA because its underwriting process for the Seck Policy was deficient[105] and Brighthouse ignored the red flags that came into its possession between 2009 and 2011.

### 1. Geronta has failed to prove entitlement to EEA's premiums under Section 198

This Court finds that Geronta has failed to prove EEA was less at fault than Brighthouse.[106] Therefore, Geronta is not entitled to restitution of the premiums paid by EEA under Restatement Section 198. Unlike when Geronta purchased the Seck Policy in 2015, Brighthouse was not on inquiry notice of the void nature of the Seck Policy when it was sold to EEA in 2009. Geronta's argument that Brighthouse was on inquiry notice of the void nature of the Seck Policy back in 2009 is unavailing for two reasons. First, as previously noted, the sale of life insurance policies

---

Court to determine.").

[102] Brighthouse's Supplemental Br. at 13.

[103] *Id.* at 14-18.

[104] *Id.*

[105] Geronta's Supplemental Br. at 6.

[106] Both Sections 198(a) and the factors from the *in pari delicto* test in 198(b) seek to discover whether the party was excusably ignorant. *See Geronta*, 284 A.3d at 69-70.

following the expiration of the contestability period is legal. Second, assuming that the IOLI flag raised by the Seck Policy's sale shortly after the contestability period was sufficient to put Brighthouse on inquiry notice of the void nature of the Seck Policy, then EEA was also on inquiry notice of the void nature of the Seck Policy since it was the one who purchased the Seck Policy shortly after the contestability period expired.

EEA, like Brighthouse, however, disregarded multiple red flags which came to its attention between 2010 and 2012. During that time, EEA unsuccessfully attempted to contact Mansour Seck; multiple doctors in the Seck Policy stated he was not their patient; and the designated contacts stated they could not provide contact information for Mansour Seck. Further, in 2011 and again in 2012, EEA conducted public records searches which revealed no Mansour Seck as described in the Seck Policy. Rather than investigate whether Mansour Seck was real when faced with multiple red flags, EEA continued paying premiums, then sold the Seck Policy on the secondary market. Accordingly, EEA and Brighthouse are equally at fault. Therefore, Geronta is not entitled to restitution EEA's premiums.[107]

### 2. Geronta has failed to prove entitlement to EEA's premiums under Section 197 and Section 199

Turning to the exceptions under Restatement Sections 197 and 199, this Court

---

[107] *Geronta*, 284 A.3d at 68-70.

concludes that Geronta has failed to prove it can recover the premiums paid by EEA under both Sections 197 and 199. Under Section 197, a party is entitled to restitution if failure to do so would constitute a disproportionate forfeiture.[108] The term forfeiture is used to refer to the "denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange."[109] "Whether the forfeiture is 'disproportionate' for the purposes of this Section will depend on the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention."[110]

An argument for restitution of premiums paid by EEA under Section 197 fails for two reasons. First, as EEA no longer owns the Seck Policy, it has not lost any right to the expectation of the death benefit. Consequently, EEA suffered no forfeiture. Second, Geronta argues that the life settlement market would be undermined were Brighthouse permitted to retain the premiums;[111] however, this type of public policy consideration is not what Section 197 contemplates. As Comment b to Section 197 notes, this exception is most appropriate "in the case of technical rules or regulations that are drawn so that their strict application would

---

[108] *Geronta*, 284 A.3d at 69-70.
[109] Restatement § 197 cmt. b.
[110] *Id.*
[111] Geronta's Supplemental Br. at 17-18.

26

result in such forfeiture if restitution were not allowed."[112]  Whether purchasers in the life settlement market will price in the risk that a policy will be void *ab initio* does not contravene any relevant public interest.

Under Section 199, a party may be entitled to restitution when that party did not engage in serious misconduct and "(a) he withdraws from the transaction before the improper purpose has been achieved, or (b) allowance of the claim would put an end to a continuing situation that is contrary to the public interest."[113]  To come within the exception under Section 199(a), "a party must actually withdraw by refusing any further participation in or benefits from the transaction.  It is not enough that the achievement of the purpose has been prevented by circumstances beyond his control."[114]  Given that EEA did not withdraw, but instead sold the Seck Policy on the life settlement market, restitution under Section 199(a) is inapplicable.  Section 199(b) applies "when the denial of restitution would leave property in the hands of one whose control of it would be contrary to the public interest, for example, because its status would be rendered so uncertain as seriously to restrain its alienation."[115]  This Court does not find permitting Brighthouse to retain the premiums paid by EEA would be so contrary to public interest to warrant restitution

---

[112] *Id.*
[113] Restatement § 199.
[114] *Id.* cmt. a.
[115] *Id.* cmt. b.

under Section 199(b). No party who handled the Seck Policy is without fault, and Brighthouse is not so clearly in the wrong so as to warrant restitution under Section 199(b).

## IV.   CONCLUSION

Consistent with the Delaware Supreme Court's directive, this Court reconsidered its factual findings utilizing the fault-based test. The Court finds, as set forth above, Geronta is entitled to the return of the premiums it paid on the Seck Policy under Section 198 of the Restatement. None of the exceptions outlined in Sections 197, 198, and 199, however, entitle Geronta to the return of the premiums EEA paid on the Seck Policy. The parties shall confer on a form of final order and file it within 14 days.

**IT IS SO ORDERED.**

*/s/ Patricia A. Winston*
**Judge Patricia A. Winston**

28